## GREGORIO LEAL, JR. V. STATE

No. 31,964. June 8, 1960

State's Motion for Rehearing Overruled October 12, 1960

*Harry J. Schulz,* Three Rivers, for appellant.

*J. Taylor Brite,* District Attorney, Cotula, and *Leon Douglas,* State's Attorney, Austin, for the state.

WOODLEY, Judge.

The offense is murder under Art. 802c V.A.P.C.; the punishment, 2 years.

The prosecution arose out of a head-on collision of an automobile traveling a highway in LaSalle County and a motorcycle traveling in the opposite direction on his right side of said highway. The accident occurred shortly after 7 A.M. on Sunday.

The appeal presents the question of whether there is sufficient evidence to sustain a finding that appellant was intoxicated.

The accident, which resulted in the death of the motorcycle rider, was witnessed by Howard Hulbert and Melvin Krahn, who were in an automobile following the motorcycle at the time. Leroy Farrell, the owner of this automobile, was asleep in the back seat.

Appellant and three companions were riding in the automobile which collided with the motorcycle. His statement to Patrolman Peterson, who investigated the accident, was to the effect that he and his companions left Nueva Laredo about 5:30 or 6:00 o'clock A.M., after eating and drinking Tom Collins mixed drinks during the night there.

His version of the accident is thus shown in his statement:

"On the way I was kind of sleepy and my eye lids felt kind of heavy, but I don't remember going to sleep while I was driving. I started driving just outside of the City Limits of Laredo, Texas on the way back. I was driving 50 to 55 miles per hour and some times 40 miles per hour. I don't remember going through any towns up until the time of the wreck.

"Just before the wreck I saw the Motorcycle coming and he looked like he was on my side of the road, I cut to the left and the motorcycle did too. I cut back to the right and let go of the steering wheel and closed my eyes, I did not hit my brakes but I did take my foot off the gas. The next thing I knew I was laying on the pavement."

State's witness Howard Hulbert gave the following description of the accident:

"Q. And just what did the car do from the time you first observed it until the time of the collision? A. When I first saw it it was over on his shoulder and then it started coming over across the center line and came all the way over to our shoulder and when it got there the motorcycle went towards the center line a little bit and just about the time the motorcycle got beside the car it looked like the driver must have *woken* up or something because the driver started to swerve back and hit the motorcycle."

State's witness Melvin Krahn testified:

"Q. Just tell the jury, please, Mr. Krahn, what happened, what you saw there from the time you first saw the automobile until the time of the collision. A. Well, the automobile, it seemed to be coming straight down the highway and all of a sudden it swerved over on its side of the road, on the side where the motorcycle was, and the motorcycle moved over a little bit, but it stayed in its lane, and then the guy in the car must have realized he was asleep or something and seen he was on the wrong side of the road and when he swerved back over he hit the motorcycle head-on."

Others who were present at the collision but did not testify were appellant's three companions in the car which struck the motorcycle, and Leroy Farrell who was in the back seat of his car which Hulbert was driving.

The accident was investigated by Texas Highway Patrolman Ray Curtis and George Peterson. The witnesses Hulbert and Krahn stayed at the scene with appellant and his companions until the patrolmen, who were called from Cotulla, arrived about 8 a.m. and made their investigation.

State's witness Hulbert testified that the driver and the boys riding in the front seat with him were thrown from the car. He testified that neither appellant nor his companions in the car: "didn't really act any out of the ordinary except they were shook up"; "Q. Could you tell whether they had been drinking or not, any of them? A. It didn't look like it to me."

And on cross-examination he testified that the driver of the car "didn't look like he was drinking or anything like that" to him, and in his opinion he was not drunk.

The witness Melvin Krahn testified that appellant appeared shocked and nervous and "didn't seem to know what he was doing" and that he formed the opinion that the man had fallen asleep driving the car and woke up suddenly and that he could not tell whether any of the occupants of the car were drinking. "They looked like they were real drowsy, but I didn't smell any liquor. I didn't pay that much attention."

The evidence shows that other persons came to the scene of the accident, including the justice of the peace from Encinal, but they were not called to testify.

Patrolman Curtis testified that appellant identified himself as

the driver of the automobile involved and that he asked for his driver's license and interrogated him about the accident, and after some 45 minutes appellant was taken to Cotulla in the patrol car.

Patrolman Curtis expressed the opinion that appellant had been drinking, "Just when I couldn't say." Though his qualification and observations were established, Patrolman Curtis was not asked whether appellant was in his opinion intoxicated at the time he observed him.

After reaching Cotulla appellant was taken before Justice of the Peace Wildenthal and a complaint was signed by Patrolman Curtis charging him with negligent homicide. Judge Wildenthal testified that appellant was not drunk at that time.

It will be noticed that no witness who saw him at the time of the collision expressed the opinion that appellant was intoxicated.

Patrolman Peterson was the state's best witness on the question of intoxication. He testified that after he arrived with Patrolman Curtis he talked to appellant who said he was the driver, observed him and his manner of walking, and his general appearance, described them and testified:

"Q. In your opinion was he intoxicated and under the influence of intoxicating liquor? A. Yes sir. At the time I was observing him pretty close to try to figure out whether he was, that caused the accident, and in my opinion he was."

On cross-examination he testified:

"Q. Not knowing when the accident happened, you don't know whether in your opinion he was intoxicated at the time the accident happened? A. No Sir * * * .

"Q. Actually in all fairness to everybody, to the defendant and to the jury, you really didn't think he was intoxicated when you were down there investigating the accident? A. That is what I was thinking, yes sir, that he was intoxicated. I was, what you would say, I was on the border line whether he was intoxicated and how much of it was caused by his actions I did not know."

The witness refused to deny that he expressed the opinion at

the scene that the accident was caused by the driver of the car going to sleep.

Appellant consenting, a specimen of his urine was taken by Patrolman Peterson at 9:35 a.m. and was introduced at the trial. It is apparent the witness Peterson, as well as the jury, relied heavily upon its alcohol content.

Roger Bickham, chemist and toxicologist, who examined the specimen, testified that the urine had an alcohol content of .15 percent which, translated to blood, was equivalent to .12 percent alcohol in the blood. He declined to testify that the person whose urine was examined was intoxicated at the time he passed the urine, but testified that he was "probably intoxicated."

Mr. Bickham testified at length and in detail, both as to the analysis and its reliability and accuracy and to the effect of certain percentages of alcohol in the body fluids. He related sufficiently his training and experience qualifying him to testify as an expert on both subjects.

The testimony of the chemist was to the effect that all persons having .15 percent alcohol in their blood were intoxicated, and some 90 percent of individuals whose blood showed an alcohol content of .12 percent would be intoxicated; that normally "your urine level is at a very close ratio to your blood level," but several factors were pointed out which would change the normal level. One was that after the alcohol was no longer going into the blood stream from the stomach, alcohol in the blood would burn up at the rate of .02 percent per hour, while alcohol that had passed into the urine in the bladder would not. It was therefore important that the bladder be drained before a specimen for analysis is taken.

It would be possible, the witness testified, for an individual whose urine showed .15 percent alcohol to have as little as .04 percent alcohol in his blood, at which level no person is intoxicated.

The expert testimony made it clear that only the alcohol in the blood stream goes to and affects the brain, and the amount of alcohol in the urine is important only as it indicates the amount of alcohol in the blood.

As we understand the evidence, the state failed to prove beyond a reasonable doubt that appellant was intoxicated at the

time of the collision. Proof that he was "probably intoxicated" or "had been drinking" or of a "border line" case of intoxication will not suffice.

Because the evidence is insufficient to sustain the conviction the judgment is reversed and the cause remanded.