NO. 07-07-0096-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

MAY 8, 2008

_____

KEVIN DWAYNE KENNEMUR, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 121ST DISTRICT COURT OF YOAKUM COUNTY;

NO. 2499; HONORABLE KELLY G. MOORE, JUDGE

_____

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**OPINION**

Appellant, Kevin Dwayne Kennemur, was convicted by a jury of intoxication manslaughter and sentenced to forty years confinement. By three issues, Appellant contends the evidence at trial was both (1) legally and (2) factually insufficient to support a conviction for intoxication manslaughter; and (3) the trial court erred in denying his motion to suppress evidence. We affirm.

## Background

Sunday evening, August 8, 2005, Appellant and Lana McLaurin drove to the Border Bar located in New Mexico. Because the Border Bar would not accept credit cards, they traveled to the Western Bar located approximately five miles west of the Texas-New Mexico state line on US Highway 380. En route, they were drinking from a bottle of wine they purchased at the Border Bar.

They entered the Western Bar at approximately 10:20 p.m.[1] Michelle Rubio was tending bar and preparing to close at 11:00 p.m. After learning the Western Bar accepted credit cards, McLaurin ordered two Colorado Bulldogs and obtained quarters for the jukebox and pool table. After Appellant finished his drink, he and McLaurin began arguing. McLaurin ordered another round of Colorado Bulldogs and took the drink to Appellant. Rubio went to the kitchen to clean and could overhear the two continuing to argue. There were no other patrons in the bar.

Rubio returned from the kitchen and asked if there was a problem. Appellant responded it was none of her "damn" business and started cursing and screaming at her. Rubio told them, if they continued arguing, they would have to leave. Appellant told Rubio to leave them alone and they would handle matters themselves. Rubio told them to keep it down and she returned to the kitchen.

---

[1] Although New Mexico is located in the Mountain Time Zone, we will calculate time throughout this opinion according to the Central Time Zone for consistency.

After Appellant finished his drink, McLaurin went to the kitchen to order a third round of drinks. When Rubio returned to the bar, Appellant was standing behind the bar with a bottle of whiskey in hand. When Rubio confronted him, he indicated he was taking the bottle because she had his credit card. After arguing back and forth with Rubio, he put the bottle back. Appellant continued to argue with Rubio while McLaurin tried to calm him down. Rubio told Appellant she was going to tab them out and they could leave. When she went to the credit card machine, Rubio noticed her tip jar was empty. She asked Appellant to put her tip money back, and he denied having the money. After arguing with Rubio further, Appellant returned the money. At that time, Appellant cursed and threatened to strike Rubio. Appellant also cursed McLaurin. Rubio was frightened and upset. At trial she testified she had never encountered a situation like that before.

After Rubio totaled up their tab and returned his credit card, Appellant offered to take McLaurin home and left for his vehicle. Rubio was concerned for McLaurin's safety and pleaded with McLaurin to allow her to take her home. While the two stood in the doorway of the bar, Appellant revved his Camaro's engine repeatedly. McLaurin left the bar and entered the vehicle from the passenger side. Before she could close her vehicle door, Appellant put the Camaro in reverse and sped so fast he backed into the barrow ditch in front of the bar.

When Appellant's vehicle came out of the ditch, the Camaro fish-tailed sideways across the gravel lot, ran a stop sign, and entered the highway in the wrong lane facing an

oncoming truck. Rubio was concerned there would be a wreck, however, an accident was averted. The time was 10:50 p.m.

The following morning at 5:45 a.m., Appellant woke Brad Palmer at his residence on U.S. 380, commonly known as State Line Road. Appellant told Palmer that he and his girlfriend had been involved in an automobile accident. He indicated he had come from the Western Bar but wasn't sure where the accident had occurred. He stated that he had been walking dirt roads for some time looking for help. Palmer called 911. At trial, Palmer testified his house was located approximately thirteen miles from the Western Bar, his house was not the closest to the scene of the accident, and the speed limit on State Line Road was seventy miles per hour.

Mark Traweek, an Emergency Medical Technician, responded to Palmer's call. He arrived first at the scene of the accident, approximately 1.1 miles from Palmer's residence, and pronounced McLaurin dead on the scene. He then went to Palmer's house. Traweek drew three tubes of blood from Appellant at approximately 6:30 a.m. He suspected alcohol was involved in the accident because Appellant smelled of alcohol and appeared to be in an "altered level of consciousness." Traweek described Appellant as very agitated, not normal, distraught, and crying. He further testified that he believed Appellant's behavior indicated there was "something that caused him to be that way."

At 7:05 a.m., Appellant was admitted to the Emergency Room at Yoakum County Hospital. When he was admitted, he appeared confused, was crying, smelled of alcohol,

4

and had slurred speech. Appellant told a nurse that he remembered waking up on the ground and walking several miles to get help. He did not remember the accident or how long he had been unconscious, but recalled McLaurin was driving. At 7:30 a.m., he was seen by Dr. Amir Menon who ordered blood tests to determine his blood alcohol content (BAC). Menon noted that Appellant smelled as if he was probably drunk. The blood drawn by Traweek at 6:30 a.m. was tested and yielded a serum BAC of 114, which converts to a whole BAC of .098, or .018 above the legal limit of .08.[2]

Menon testified 114 was high, with a normal BAC being between 0 to 100. He further testified that a normal person's BAC should drop on the average 20 to 30 points every couple of hours. He stated that this was the standard used by internists in the emergency room for determining how long a patient under the influence of alcohol should be held before being released. Thus, he testified, if a person has a serum BAC level of 114 at a particular point in time, a couple of hours earlier it might have been 200 or 150. He opined that Appellant's BAC may have been as high as 184 to 194 at the time of the accident. Based upon Appellant's history and elevated liver enzyme level, Menon believed Appellant had an alcohol appetite and was probably a chronic drinker.

At 10:03 a.m., DPS Trooper Mark Matlock visited Appellant and obtained a voluntary statement. Appellant's statement indicated that McLaurin was driving at the time of the accident. Appellant told Matlock that, when they left the Western Bar, he laid his seat back

---

[2]Tex. Pen. Code Ann. § 49.01(2) (Vernon 2003).

to rest and fell asleep in the passenger seat. When he woke up, the vehicle was upside down. He shook McLaurin and she would not wake up. He pulled her from the vehicle and went for help. He could not see well because he did not have his glasses and searched a long time before finding Palmer's house. Matlock testified Appellant's breath and person emanated a strong odor of alcoholic beverage and his eyes were red and bloodshot. Matlock had a mandatory blood draw taken that subsequently yielded a BAC of .03.

Sheila Barrientes, an acquaintance of Appellant, also visited him in the Emergency Room between 11:00 a.m. to 12:00 p.m. She testified Appellant smelled very strongly of alcoholic beverage, that it was "horrendous" and like "nothing that I had ever encountered."

On August 23, 2005, Matlock and DPS Sergeant Mike McClure confronted Appellant with Rubio's statement that he was driving when the couple left the Western Bar. Appellant indicated it was possible he was driving when they left the bar because he remembered that they later stopped for McLaurin to urinate. Appellant further recalled that it was at that point they switched seats and McLaurin began driving.

At trial, Matlock was permitted to give opinion testimony regarding intoxication and accident reconstruction. Matlock's investigation indicated the Camaro was traveling at a minimum of 113 miles per hour when the vehicle skidded into the oncoming lane of traffic and turned completely sideways before traveling backwards. At that point, the passenger side of the vehicle dug into a narrow berm in the ditch opposite its original lane of traffic and started to roll. The Camaro then inverted with the rear passenger side hitting a utility

6

pole two to three feet above the ground. The passenger side of the vehicle sustained severe damage, while damage to the driver's side was minimal.

Matlock opined that the accident occurred at 11:30 p.m., the approximate time necessary to drive from the Western Bar to the crash site. He also opined McLaurin was in the passenger seat at the time of the accident because she was found on the ground just outside the passenger side and the massive damage to the passenger side of the vehicle was consistent with her injuries. He indicated Appellant's injuries were minimal consistent with the damage to the driver's side. Furthermore, Matlock testified Appellant's version of what occurred post-accident was inconsistent with the crash site, *i.e.* Appellant could not have exited through the passenger door because it was jammed shut and there was no evidence McLaurin's body had been pulled from the vehicle as he had described. Furthermore, the passenger seat was in an upright position–not a reclined position as described by Appellant. Matlock further opined that the cause of the accident was Appellant's intoxicated state, combined with vehicular speed. He based his opinion upon Appellant's highly agitated state leaving the Western Bar after drinking, his BAC of .098 nearly seven hours after the accident, and the strong smell of alcohol on Appellant's breath and person at the Palmer residence and in the Emergency Room.

Tim Lovett, a second expert certified in accident reconstruction, agreed with Matlock's analysis that Appellant was the driver at the time of the accident. Lovett also cited McLaurin's autopsy report as evidence that her injuries were consistent with her being

a passenger, *i.e.* patterned injuries that could only have come from the seat belt hanger and/or door latch on the passenger side. In addition, the wreckage indicated that the only exit from which McLaurin could have been ejected prior to the collision was the passenger window. Lovett also testified Appellant's intoxication combined with the speed of the vehicle caused the accident that claimed McLaurin's life.

John Bundy, a forensic scientist in the DPS Trace section specializing in shoe prints, tested the Camaro's brake and accelerator pedals for shoe prints. Using oblique lighting and alternative lighting, Bundy was able to detect a dust impression on the brake pedal identical to the tread design on Appellant's shoes. He testified the dust impression was very fragile and could be easily obliterated by an overlapping impression or someone else putting their foot on the brake. He found nothing on either the gas or brake pedal similar to the pattern on McLaurin's sandals. However, without the presence of accidentals, *i.e.* microscopic scratches, stone holes, or nicks making the pattern unique, he could not testify that the shoe print on the brake pedal was, in fact, made by Appellant's shoe.

Thomas Beaver, forensic pathologist and Chief Medical Examiner in Lubbock, opined that in the period of time between 11:30 p.m. and 6:30 a.m., Appellant's stomach would have emptied its contents completely and Appellant would have been in a post-absorptive stage. Beaver testified that whenever a person is in a post-absorptive stage their liver begins to eliminate alcohol from the blood, thereby causing their BAC to fall over time. The range established for individuals to metabolize alcohol on an hourly basis is

generally considered to be .015 to .025 per hour depending on a number of factors such as body size and metabolic rate. Based on this information, Beaver concluded that because Appellant was in a post-absorptive stage with a BAC of .098 at 6:30 a.m., he would have had a higher BAC at an earlier time.

Beaver also agreed with Matlock and Lovett that McLaurin was seated in the passenger seat at the time of the wreck. He testified her cause of death was multiple trauma consistent with her being a passenger. The most important factor for Beaver was her spinal fractures which he described as a "hallmark of being ejected from the vehicle." He also testified McLaurin's BAC was .032 and she had two hundred fifty milliliters of urine in her bladder. He considered this amount of urine to fill at least half the capacity of her bladder which would have prompted her to empty her bladder. Once started, he opined it would have been difficult for her to stop urinating because her bladder was distended at two hundred fifty milliliters. A person might be able to stop at fifty or twenty-five milliliters but, at two hundred fifty milliliters, the bladder would want to continue emptying. He further opined that, typically, he would not expect to see that much urine in her body at time of death.

**Discussion**

Appellant contends the State's evidence at trial was legally insufficient to prove he was intoxicated at the time of the accident under either an impairment or per se theory of intoxication. Alternatively, he asserts the evidence is factually insufficient to support his

9

conviction.[3]  Finally, Appellant contends the trial court erred in its denial of his motion to suppress his blood alcohol test results and medical records for treatment administered by Yoakum County Hospital on August 9 and 10, 2005.  He contends their release violated federal privacy guarantees under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[4]  Logic dictates we consider Appellant's third issue regarding the suppression of evidence first–before we determine the legal and factual sufficiency of the evidence.

## I.  Motion to Suppress

Appellant contends the trial court erred by permitting the State to put into evidence his medical records and blood alcohol test results obtained pursuant to a subpoena duces tecum issued to the custodian of records at the Yoakum County Hospital.  Appellant asserts the evidence was obtained in violation of HIPAA's Privacy Rule because the

---

[3]When both legal and factual sufficiency are challenged, we must first determine whether the evidence is legally sufficient to support the judgment.  *Campbell v. State,* 139 S.W.3d 676, 683 (Tex.App.–Amarillo 2003, no pet.).

[4]*See* Pub. L. No. 104-191, 110 Stat. 1936 (1996), codified as amended at 42 U.S.C. §§ 1320d to 1320d-8 (2007).  Specifically, Appellant contends the disclosure of his medical records violated HIPAA's Privacy Rule.  The United States Department of Health and Human Services promulgated the Privacy Rule under title 45 of the Code of Federal Regulations. *See* 45 C.F.R. pts. 160 & 164 (2008) (Privacy Rule).

subpoena was neither a grand jury subpoena nor a subpoena issued by a judicial officer. *See* 45 C.F.R. § 164.512(f)(1)(ii) (2008).[5]

There is no Fourth Amendment reasonable expectation of privacy protecting blood alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic accident. *State v. Hardy,* 963 S.W.2d 516, 527 (Tex.Crim.App. 1997). The *Hardy* rule applies in instances where the accused challenges the State's use of his or her medical records at trial due to an alleged HIPAA violation. *See Murray v. State,* 245 S.W.3d 37, 42 (Tex.App.–Austin 2007, pet. filed); *Tapp v. State,* 108 S.W.3d 459, 461-62 (Tex.App.–Houston 2003, pet. ref'd). Because Appellant has no constitutional or statutory reasonable expectation of privacy with respect to blood alcohol test results obtained solely for medical purposes following an accident, he has no standing to complain that the State obtained his medical records in violation of HIPAA. *See Ramos v. State,* 124 S.W.3d 326, 338-39 (Tex.App.–Fort Worth 2003, pet. ref'd).

We are mindful that a "standard, requirement or implementation specification" adopted under the Privacy Rule generally preempts contrary state laws. *Murray,* 245 S.W.3d at 42 (citing 45 C.F.R. § 160.203). Nevertheless, we are constrained to follow existing law under *Hardy* absent any guidance or instructions to the contrary from the Court

---

[5]Pursuant to HIPAA, an individual's medical information cannot be disclosed by covered entities without the individual's consent unless disclosure is expressly permitted by HIPAA. 45 C.F.R. § 164.502. There are several instances where disclosure is permitted without the individual's authorization under § 164.512. However such disclosures must meet the requirements of §164.512 (c), (e) or (f). § 164.512(a)(2).

of Criminal Appeals. *Id.; Tapp,* 108 S.W.3d at 463. That said, HIPAA requirements for disclosure conform with the holding in *Hardy* as follows:

> A covered health care provider providing emergency health care in response to a medical emergency . . . may disclose protected health care information to a law enforcement official if such disclosure appears necessary to alert law enforcement to: (A) The commission and nature of a crime; (B) The location of such crime or of the victim(s) of such crime; and (C) The identity, description, and location of the perpetrator of such crime.

45 C.F.R. § 164.512(f)(6)(I).

Moreover, under the provision relied upon by Appellant, his medical information was also properly disclosed per the subpoena duces tecum. Under § 164.512(f)(1)(i), a covered entity may disclose protected health information for law enforcement purposes to a law enforcement official if the disclosure is "[p]ursuant to process"[6] and is as "required by law."[7] Here, the subpoena was issued at the request of the Criminal District Attorney

---

[6]A subpoena is considered lawful process under HIPAA. § 164.512(e)(1)(ii) ("In response to a subpoena, discovery request, or other lawful process . . ."). *See also* Black's Law Dictionary 1242 (8th Ed. 2004) (process defined as summons or writ, esp. to appear or respond in court); *Id.* at 1467 (subpoena defined as a writ commanding a person to appear before court or other tribunal, subject to a penalty for failing to comply).

[7]"Required by law" is defined as "a mandate contained in law that compels an entity to make a use or disclosure of protected health information and that is enforceable in a court of law." § 164.103. "Required by law includes, *but is not limited to*, court orders and court-ordered warrants; subpoenas or summons issued by a court, grand jury, a governmental or tribal inspector general, or an administrative body authorized to require the production of information . . . ." *Id.* (emphasis added). Moreover, in promulgating its Final Rule related to disclosures to law enforcement officials, the Department of Health and Human Services stated:

12

for law enforcement purposes. The subpoena required the custodian of records to appear in the 121st District Court with the requested documents, and non-compliance was subject to a fine not exceeding five hundred dollars. *See also* Tex. Code Crim. Proc. Ann. arts. 24.01-06 (Vernon Supp. 2007). Accordingly, because the trial court committed no error in admitting Appellant's medical information, issue three is overruled.

## II.  Legal Sufficiency of the Evidence

When conducting a legal sufficiency review of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Drichas v. State*, 175 S.W.3d 795, 798 (Tex.Crim.App. 2005). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this is the function of the trier of fact. *See Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). Instead, we determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the

---

We did not intend to preempt generally state laws . . ., and in § 164.512(f)(1)(i) of the final rule, we explicitly permit covered entities to disclose protected health information for law enforcement purposes as required by other law. This provision permits covered entities to comply with these state and other laws.

45 CFR Parts 160 and 164: Standards for Privacy of Individually Identifiable Health Information; Final Rule, 65 Fed. Reg. 82531 (Dec. 28, 2000).

light most favorable to the adjudication. *Adelman v.* State, 828 S.W.2d 418, 422 (Tex.Crim.App. 1992). In so doing, we resolve any inconsistencies in the evidence in favor of the adjudication. *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App. 1991).

Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to warrant the conviction. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Circumstantial evidence is as probative as direct evidence in establishing an accused's guilt, and circumstantial evidence alone can be sufficient. *Id.* On appeal, the same standard of review is used for both circumstantial and direct evidence cases. *Id.*

A person commits the offense of intoxication manslaughter if the person: (1) operates a motor vehicle in a public place; (2) is intoxicated, and (3) by reason of that intoxication, (4) causes the death of another by accident or mistake. Tex. Penal Code Ann. § 49.08(a) (Vernon Supp. 2007). A person is considered "intoxicated" if the person: (1) does not have the normal use of their mental or physical faculties by reason of the introduction of alcohol into the body; or (2) has an alcohol concentration of 0.08 or more. Tex. Penal Code Ann. § 49.01(2) (Vernon 2003). Thus, there are two alternative means or theories by which the State can prove intoxication, *i.e.* impairment of the use of normal mental or physical faculties and/or per se. *Bagheri v. State*, 119 S.W.3d 755, 762 (Tex.Crim.App. 2003).

14

Evidence of the appellant's appearance, condition, and actions; *Mercer v. State*, 143 Tex. Crim. 196, 157 S.W.2d 919, 920 (1941), the manner in which the appellant managed his vehicle; *Sanchez v. State,* 398 S.W.2d 117 (Tex.Crim.App. 1966)(speed prior to collision probative); *Allen v. State,* 149 Tex. Crim. 612, 197 S.W.2d 1013 (1946)(speed and force of collision relevant); *Allcott v. State,* 158 S.W.3d 73, 75 (Tex.App.–Houston [14th Dist.] 2005, no pet.), and the victim's injuries; *Etheridge v. State,* 903 S.W.2d 1, 14 (Tex.Crim.App. 1994), may comprise circumstantial evidence of the fact of intoxication and a causal connection with the death of the deceased.

Taken in the light most favorable to the verdict, the evidence at trial showed Appellant was drinking prior to the accident, was behaving in an irrational and threatening way, and he drove away from the Western Bar in a reckless manner. When the accident occurred,[8] Appellant was driving[9] at more than one hundred thirteen miles per hour and he

---

[8]Although Matlock's estimate that the accident occurred at 11:30 p.m. is inexact, "proof of the precise time of the accident or of driving is not the *sine qua non* of driving while intoxicated." *Zavala v. State,* 89 S.W.3d 134, 139 (Tex.App.–Corpus Christi 2002, no pet.)(time of accident unknown). There must only be proof from which the jury can find that the defendant was intoxicated at the time of driving whenever that may have been. *Layland v. State,* 144 S.W.3d 647, 651 (Tex.App.–Beaumont 2004, no pet.); *Zavala,* 89 S.W.3d at 139. In other words, there must be a "link" between driving and intoxication. *Id.* The time-lapse between the evidence of Appellant's last drink at the Western Bar and the intervening accident and subsequent blood test was a jury question addressed to the weight of the evidence. *Howard v. State,* 155 Tex.Crim. 36, 230 S.W.2d 213, 213-14 (1950). Moreover, after the Court of Criminal Appeals abrogated the reasonable-hypothesis-of-innocence analytical construct in *Geesa v. State,* 820 S.W.2d 154, 155 (Tex.Crim.App. 1991), *overruled in part on other grounds, Paulson v. State,* 28 S.W.3d 570 (Tex.Crim.App. 2000), the State need not negate the possibility that the defendant became intoxicated after the accident in the absence of such evidence as we have here.

[9]The State's uncontroverted expert testimony based on the location and position of the victim's body, her injuries, Appellant's injuries, damage to the vehicle, accident

15

lost control of his vehicle on a straight stretch of roadway with no obstructions. His vehicle left the roadway and became airborne ultimately striking a utility pole on the passenger side. The victim was ejected from the passenger side of the vehicle. As a result of the accident, McLaurin sustained severe injuries resulting in her death.

Approximately seven hours after the accident, Appellant tested over the legal limit for alcohol consumption with a .098 BAC. EMT Traweek testified Appellant smelled of alcoholic beverage and was very agitated, not normal, distraught, crying, and believed Appellant's behavior exhibited "an altered state of consciousness." An hour later at the Emergency Room, the ER doctor noticed Appellant smelled as if he were drunk, ordered blood tests, and treated him for alcohol abuse in addition to minor injuries. Approximately, two hours later, Appellant continued to emit a strong odor of alcohol. Based upon the evidence of his drinking, erratic behavior, and reckless driving prior to the accident, the extreme recklessness with which the accident occurred, the damage to the vehicle, the victim's injuries, and the post-accident aroma of alcohol on Appellant's person, the jury could have inferred and rationally found that Appellant operated a motor vehicle in a public place while intoxicated, and that by reason of that intoxication caused the death of another

reconstruction, and Appellant's footprint on the brake pedal that Appellant was the driver of the vehicle at the time of the accident could lead a rational juror to find beyond a reasonable doubt Appellant was the driver of the vehicle at the time of the accident. The jury could also reasonably infer from the amount of urine in the victim's bladder at the time of her death that Appellant neither stopped for her to urinate nor switched to the passenger seat. The fact that Appellant altered his statements regarding when and how he became a passenger after he was confronted with third party evidence of the events leading up to the accident could also have led to an adverse credibility determination by the jury.

16

by accident or mistake.  *See Hale v. State,* 194 S.W.3d 39, 40 (Tex.App.–Texarkana 2006, no pet.)(driving while intoxicated at a high rate of speed cannot possibly be characterized as being insufficient conduct to cause an accident); *Martinez v. State,* 66 S.W.3d 467, 470 (Tex.App.–Houston [1st Dist.] 2001, pet. ref'd).

Moreover, Appellant's appearance and blood alcohol test, although taken hours after the accident occurred, tend to make it more probable that he was intoxicated at the time of the collision because they provided evidence that he had introduced alcohol into the body prior to the accident.  *See Stewart,* 129 S.W.3d at 96-97.  In the absence of any evidence Appellant consumed alcohol after leaving the Western Bar or following the accident, Appellant's intoxicated state at the time his blood was taken by EMT Traweek at 6:30 a.m. on Monday could only have arisen from drinking prior to his departure from the Western Bar at 10:50 p.m. on Sunday.  Thus, it follows that Appellant must have been intoxicated within the time periods which included the time the accident occurred.  *See Zavala v. State,* 89 S.W.3d 134, 140 (Tex.App.–Corpus Christi 2002, no pet.); *Purvis v. State*, 4 S.W.3d 118, 119, 121-22 (Tex.App.--Waco 1999, no pet.).

Appellant's reliance on *Leal v. State*, 170 Tex. Crim. 71, 338 S.W.2d 443 (1960), is misplaced.  In *Leal*, appellant struck a motorcyclist around 8:00 a.m. after eating and drinking at an establishment until 5:30 - 6:00 a.m.  Witnesses at the accident scene indicated appellant was not intoxicated, did not smell of alcoholic beverage, and could not testify when appellant had been drinking.  *Id.* at 443-444.  A urine specimen taken at 9:35

a.m. yielded a BAC of .12. *Id*. at 445. A chemist testified "[i]t would be possible . . . for an individual whose urine showed .15 alcohol to have as little as .04 percent alcohol in his blood, at which level no person is intoxicated." *Id*. The Court also described the expert testimony as equivocal indicating appellant was "probably intoxicated," or "had been drinking," or was a "border line" case of intoxication. *Id.* at 446. Based upon the evidence, the *Leal* Court held that the State's evidence was legally insufficient to show appellant was intoxicated at the time of the collision. *Id*.

Here, unlike *Leal*, there is evidence of drinking, irrational and threatening behavior, and reckless driving before the accident. Unlike *Leal*, there is also evidence Appellant's driving was extremely reckless prior to the collision with the utility pole, damage to the vehicle was substantial, and the victim's injuries were numerous and fatal. Hours afterwards, in the absence of any evidence indicating Appellant ingested any alcoholic beverage since leaving the bar, Appellant's BAC was .098 and he smelled of alcohol. Later yet, he continued to smell strongly of alcohol. Furthermore, unlike *Leal*, the State's expert evidence on intoxication in this case was not equivocal. Thus, *Leal* is inapposite.

Accordingly, we find that a factfinder could reasonably have found Appellant operated his motor vehicle at a time when he did not have the "normal use" of his mental or physical faculties or when he had an alcohol concentration of .08 or more and, "but for" his intoxication, the victim's death would not have occurred. Appellant's first issue is overruled.

18

## III.    Factual Sufficiency of the Evidence

When conducting a factual sufficiency review, we examine all the evidence in a neutral light and determine whether the trier of fact was rationally justified in finding guilt beyond a reasonable doubt. *Roberts v. State,* 220 S.W.3d 521, 524 (Tex.Crim.App.), *cert. denied,* ___ U.S. ___,128 S.Ct. 282, 76 U.S.L.W. 3165 (2007); *Watson v. State*, 204 S.W. 3d 404, 415 (Tex.Crim.App. 2006).   We are to give deference to the factfinder's determination if supported by the record, and cannot reverse a conviction unless we find some objective basis in the record that demonstrates that the great weight and preponderance of the evidence contradicts the verdict. *Id. at 417.*  The criminal verdict will be set aside "only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust, or the contrary evidence so strong that the standard of proof beyond a reasonable doubt could not have been met."  *Garza v. State,* 213 S.W.3d 338, 343 (Tex.Crim.App. 2007).  In addition, we must include a discussion of the most important evidence that the appellant claims undermines the verdict.   *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

Appellant contends the evidence is factually insufficient to support his conviction because: (1) his BAC of .098 was an unreliable indicator of intoxication because the blood sample was obtained seven hours after the accident; (2) Rubio testified he was not intoxicated when he drove away from the Western Bar; (3) he scored well on the Glasgow Coma test near to the time his blood sample was taken; and (4) EMT Traweek

19

contaminated his blood sample by wiping Appellant's arm with an alcohol wipe prior to taking the blood sample. Appellant also asserts the State's evidence of intoxication at the time of the accident was insufficient because the State did not produce an expert who could reliably quantify Appellant's BAC at the time of the accident by retrograde extrapolation[10] due to unknown variables. Additionally, Appellant asserts that the results of the blood test may have been skewed if he were in an absorption stage.

The BAC results of the blood draw taken by EMT Traweek are probative of Appellant's intoxication at the time of the accident even in the absence of any retrograde extrapolation. *State v. Melcher,* 153 S.W.3d 435, 440 (Tex.Crim.App. 2005); *Stewart v. State,* 129 S.W.3d 93, 97 (Tex.Crim.App. 2004); *Letner v. State,* 138 S.W.3d 539, 541 (Tex.App.–Beaumont 2004, no pet.). Furthermore, under an impairment theory, the State need not prove the defendant's exact BAC at the time of the accident. *See Jackson v. State,* 50 S.W.3d 579, 588 (Tex.App.–Fort Worth 2001, pet. ref'd).

The State's expert, Beaver, acknowledged the difficulties in conducting a retrograde extrapolation due to the time-lag between when the accident occurred and Appellant's blood draw for testing purposes. Nevertheless, he did testify that, while he could not give

---

[10]Retrograde extrapolation is the technique by which alcohol concentration at some earlier time is estimated based on the results of testing at a later time. *Mata v. State,* 46 S.W.3d 902, 908-09 (Tex.Crim.App. 2001). "[A] single test conducted some time after the offense could result in a reliable extrapolation only if the expert had knowledge of many personal characteristics and behaviors of the defendant," and a reasonable interval between the offense and the test would be less than one hour. *Id.*

20

an exact measurement of Appellant's BAC at the time of the accident, he was comfortable opining that, if a person had a blood alcohol level of .098 at 6:30 a.m., that person's BAC would have been higher still at an earlier time. He indicated that, while it was difficult to assign a specific number to the increase in BAC, he didn't believe anyone would disagree with a range of .015 to .025 per hour. Menon, the ER doctor who treated Appellant, also testified that Appellant's blood alcohol level would have been higher at the time of the accident based upon a standard measurement used by internists in the Emergency Room. Appellant offered no evidence to rebut these opinions.

Beaver also testified that too many hours had passed between the estimated time of the accident, 11:30 p.m. on Sunday, and the time of the blood draw the next morning, 6:30 a.m. on Monday, for Appellant to be in an absorptive stage. In fact, he testified there was "no chance." He further testified that, given this passage of time, Appellant had to be "post-absorptive, which means that his blood alcohol has to be falling over time." Appellant offered no evidence to rebut these opinions. If Appellant had produced evidence showing his BAC actually increased or of factors that could lead to that result, "the question of lag-time between driving and the test becomes a matter to be weighed by the jury." *Garcia v. State,* 112 S.W.3d 839, 851 (Tex.App.–Houston [14th Dist.] 2003, no pet.). Given the State's evidence in support of the jury's finding that Appellant was intoxicated at the time of the accident and the absence of evidence in rebuttal by Appellant, we cannot say the verdict is clearly wrong or manifestly unjust.

21

Neither does Rubio's testimony indicating Appellant was not intoxicated when he left the Western Bar, EMT Traweek's wiping of Appellant's arm with an alcohol wipe prior to taking the blood sample, and/or Appellant's score on the Glasgow Coma test near to the time his blood sample was taken, constitute a "great weight or preponderance of evidence" in contradiction of the jury's verdict. Jurors being the exclusive judges of the facts and weight to be given testimony were free to believe the State's witnesses and evidence rather than Rubio or the results of Appellant's Glasgow Coma test on the issue of Appellant's intoxicated state. *See Matula v. State,* 972 S.W.2d 891, 893 (Tex.App.–Corpus Christi 1998, no pet.).

Furthermore, the use of a cleansing solution containing alcohol in connection with a blood test is merely a factor to be weighed by the jury. *Kaufman v. State,* 632 S.W.2d 685, 687-88 (Tex.App.–Eastland 1982, pet. ref'd). Although Matlock testified that it was not his practice to use alcohol preps or swabs when taking a blood draw, Traweek testified that the alcohol from the wipe would have evaporated prior to the needle being inserted for the blood draw. Beaver corroborated Traweek's testimony and opined that the alcohol swipe would not affect the accuracy of the test. Thus, we defer to the factfinder since the determination is supported by the record.

Accordingly, we find that the evidence was factually sufficient because the verdict was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and

unjust.  Because the evidence was factually sufficient to support a finding that Appellant's intoxication caused the victim's death, we overrule his second issue as well.

**Conclusion**

Having overruled all of Appellant's issues, we affirm the trial court's judgment.

Patrick A. Pirtle
Justice

Publish.