**Opinion issued January 12, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00837-CR

_____

**BRENT ALAN DALTON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the County Criminal Court at Law No. 13**
**Harris County, Texas**
**Trial Court Case No. 1944593**

---

## MEMORANDUM OPINION

A jury convicted appellant, Brent Alan Dalton, of driving while intoxicated ("DWI"),[1] and the trial court assessed his punishment at confinement for sixty days. In his sole point of error, appellant argues that the evidence is legally

---

[1] *See* TEX. PENAL CODE ANN. § 49.04 (Vernon Supp. 2015).

insufficient to prove a temporal link between his driving and intoxication so as to establish that he was guilty of DWI.

We affirm.

### Background

Deputy P. Magee, with the Harris County Precinct 4 Constables' Office, testified that at approximately 4:30 p.m. on February 8, 2014, he received a dispatch to respond to a report of an erratic driver who had forced another car off the road. The report from dispatch stated that the vehicle involved was a maroon Chevrolet Silverado pickup truck, and the dispatcher provided him with a license plate number. Once Deputy Magee found the truck matching the description from dispatch, he followed it into a parking lot and activated his emergency lights. However, the driver, later identified as appellant continued to drive slowly through the parking lot before coming to a brief stop. Deputy Magee then used the public address system in his patrol car to command appellant to park his vehicle, turn off his engine, and remain in his truck. Rather than comply, appellant drove away, and Deputy Magee followed him through the parking lot until appellant stopped again. Deputy Magee again advised appellant over the public address system to stop his vehicle, roll down his window, and remain in his vehicle.

Once appellant stopped his vehicle, he exited the driver's side of the truck and approached Deputy Magee in his patrol car. Deputy Magee testified that he

commanded appellant at least two more times to stop and return to his vehicle, but appellant did not comply. Deputy Magee noticed that appellant "didn't seem to have the best balance" as he approached. Deputy Magee also observed that no one else was in the truck. By this time, Deputy L. King had arrived on the scene and approached appellant from behind. Deputy Magee testified that Deputy King was able to detain appellant and place him in handcuffs in the back of her patrol car. In addition to the fact that appellant was not steady on his feet, Deputy Magee noticed that when appellant spoke to another deputy on the scene his "speech was obviously slurred" and "there was no consistent train of thought." Appellant was examined by EMS and then Deputy King took him to the Houston Police Department's ("HPD") "Central Intox" facility for evaluation.

Deputy King testified that she also received the same dispatch as Deputy Magee. When she arrived on the scene in the parking lot, she observed appellant approaching Deputy Magee. She stated that appellant was approaching Deputy Magee "aggressively," and she testified that appellant "was staggering, but he was charging in [Deputy Magee's] direction." Deputy King approached appellant from behind and detained him. She stated that appellant had "blood shot eyes, slurry speech, was unable to stand by himself. I mean, I literally had to hold him to take him back to my car."

3

Deputy King noticed that appellant had "EKG tags" on him, so she asked appellant if he was under a doctor's care. He told her that he took Lorcet for seizures and that he had Guillain-Barre syndrome. Regarding the Guillain-Barre syndrome, Deputy King testified that she was not familiar with that illness, that appellant explained to her later that it affects the nervous system, and that she did not know whether that illness affected appellant's balance. Appellant also told Deputy King that he had been to the bank and the hospital earlier in the day. Deputy King stated that appellant did not mention why he had been at the hospital and that "[h]e just kept going in and out. One minute, he would try to talk; and then he will go out whereas you couldn't hear or understand nothing he was saying."

Deputy King offered to contact someone for appellant. Appellant told her to call his wife, but he could not remember his wife's name or phone number. Eventually, another deputy found appellant's cell phone and was able to contact his wife. Deputy King also called EMS to assess appellant and make sure he did not have any "medical concerns that we needed to address." EMS evaluated appellant and released him back to Deputy King. Deputy King transported appellant to HPD's "Central Intox" for an evaluation because she suspected that he was intoxicated, but she did not think he had been consuming alcohol because she did not smell alcohol on his breath.

4

Deputy King testified that appellant agreed to give a breath sample and perform standardized field sobriety tests, which were administered by an HPD officer who was certified to perform the tests. Deputy King stated that his breath sample "tested all zeros," showing that he was not under the influence of alcohol. Appellant was also evaluated by HPD Officer D. Ciers, with the HPD DWI task force, who was certified as a drug recognition expert. The officers then requested that appellant give a blood sample, but he refused. Deputy King testified that appellant then had a seizure and was transported to the hospital. She obtained a search warrant to get a sample of appellant's blood. Deputy King received the signed search warrant at 11:41 p.m., and the blood sample was taken at the hospital pursuant to the warrant.

HPD Officer B. Bougere testified that she administered some standardized field sobriety tests to appellant, during which he demonstrated signs of intoxication. Officer Bougere also administered appellant's breath test, which indicated that he was not under the influence of alcohol. She likewise noticed that appellant had glassy eyes, was swaying, and his speech was slurred.

Officer Ciers testified that he was a certified drug recognition expert with special training and experience to evaluate and recognize suspects who are under the influence of some sort of drug. He testified that the other investigating officers asked him to evaluate appellant because they believed appellant was under the

5

influence of something other than alcohol. Officer Ciers first saw appellant between 9:30 and 9:40 p.m. and observed that appellant had slow, slurred speech, that his balance and walking were "unsteady," his coordination was sluggish, and he "looked a little disoriented." As part of his evaluation, Officer Ciers interviewed appellant, who informed him that he had diabetes and Guillain-Barre syndrome. Appellant told Officer Ciers that he was taking prescription medications—Norco, a sleep aid, Elavil, a central nervous system depressant, and Phenergan. Appellant told Officer Ciers that he took the Norco and Elavil at around 5:00 p.m., which appellant described as being approximately fifteen minutes before driving. However, Officer Ciers stated that 5:00 was after the time appellant was stopped by the Precinct 4 constables. Officer Ciers testified that someone taking Elavil or another central nervous depressant would have characteristics similar to someone under the influence of alcohol, which is also a central nervous system depressant: "[s]low, sluggish, disoriented, slurred speech, drunk-like behavior." He testified that central nervous system depressants, like the ones appellant admitted to taking, were typically active in a person's system for between one and eight hours.

Officer Ciers testified that he administered the HGN test to appellant and that appellant demonstrated six out of six clues of intoxication on that test. Appellant also demonstrated four out of eight clues of intoxication on the walk-and-turn test and two out of four clues of intoxication on the one-legged-stand test.

6

Officer Ciers testified that appellant also demonstrated other characteristics—such as lowered pulse rate, blood pressure, and body temperature—of someone under the influence of a central nervous system depressant. Officer Ciers concluded, based on his evaluation of appellant, that appellant was under the influence of a central nervous system depressant. On cross examination, Officer Ciers acknowledged that he was not familiar with Guillain-Barre syndrome and did not know if that could have affected appellant's performance during his examination. Officer Ciers also stated that someone having a diabetic episode could demonstrate behavior similar to that of an intoxicated person, but he understood that the EMTs had checked appellant's blood sugar and reported that it was within the normal range, and Ciers did not believe that appellant was having a diabetic episode at the time of the evaluation.

HPD Officer S. Johnson testified that he assisted Deputy King with her investigation of appellant once she arrived at the Central Intox facility. He participated in administering statutory warnings to appellant, filling out the report, and obtaining the warrant and blood sample. Officer Johnson testified that when he informed appellant that they had obtained a warrant and that appellant would have to give a blood sample, appellant fell to the floor in the fetal position and told him that he was having a seizure and could not move. Officer Johnson stated that he called paramedics, who assessed appellant and eventually transported him to the

hospital where the blood was drawn. Appellant was eventually released from the hospital to Officer Johnson's custody, and the doctor told Officer Johnson that appellant was treated for dehydration. Officer Johnson returned appellant to jail, where he was booked for the offense of DWI.

Finally, Jessica Ayala, a forensic scientist, testified regarding the results of appellant's toxicology tests. She stated that appellant's blood tested positive for the presence of marijuana and marijuana metabolites, hydrocodone, nordiazepam, diazepam, and temazepam. Ayala testified that marijuana "can have a range of effects" and that it could cause "sedation, hallucinations," or increased pulse or blood pressure. She stated that hydrocodone was a central nervous system depressant, so it had the opposite effect and would "slow[] everything down," including pulse rate and blood pressure. It could cause "dizziness, incoordination, confusion, and sedation." Ayala testified that nordiazepam, diazepam, and temazepam were all benzodiazepines and were also central nervous system depressants with similar effects to the hydrocodone.

The jury convicted appellant of DWI, and the trial court assessed his punishment at confinement for sixty days.

**Sufficiency of the Evidence**

In his sole point of error on appeal, appellant argues that the evidence was insufficient to support his conviction because there was insufficient evidence of a temporal link between his intoxication and his operation of the vehicle.

## A.    Standard of Review

When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). Our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Furthermore, direct and circumstantial evidence are treated equally, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Id.* Circumstantial evidence alone can be sufficient to establish guilt. *Id.* The fact finder is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder.

*Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see also Clayton*, 235 S.W.3d at 778 ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

A person commits the offense of DWI if he "is intoxicated while operating a motor vehicle in a public place." TEX. PENAL CODE ANN. § 49.04 (Vernon Supp. 2015). The Penal Code defines "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body." *Id.* § 49.01(2)(A) (Vernon 2011). The State does not need to establish the exact time that the defendant was operating the vehicle to prove he was driving while intoxicated. *See Kuciemba v. State*, 310 S.W.3d 460, 462–63 (Tex. Crim. App. 2010); *Kennemur v. State*, 280 S.W.3d 305, 314 n.8 (Tex. App.—Amarillo 2008, pet. ref'd). However, the State must show a "temporal link" between the defendant's intoxication and his operation of the vehicle—there must be proof from which the jury can conclude that, at the time of the driving in question, the defendant was intoxicated. *Kuciemba*, 310 S.W.3d at 462; *Zavala v. State*, 89 S.W.3d 134, 139 (Tex. App.—Corpus Christi 2002, no pet.). Driving while intoxicated may be supported solely by circumstantial evidence. *Kuciemba*, 310 S.W.3d at 462.

**B.     Analysis**

The State had to prove that appellant operated a motor vehicle in a public place while he was intoxicated, i.e., while he did not have "the normal use of [his] mental or physical faculties by reason of the introduction of . . . a drug . . . or any other substance into [his] body." *See* TEX. PENAL CODE ANN. §§ 49.01(2)(A), 49.04. Deputy Magee testified that he observed appellant driving his truck, that appellant exited the driver's side of the truck, and that no one else was in the vehicle with appellant at the time he was stopped. Furthermore, both Deputy Magee and Deputy King testified regarding appellant's condition at the time of the stop. Deputy Magee noticed that appellant did not follow his commands, "didn't seem to have the best balance," had "obviously slurred" speech, and was unable to form a "consistent train of thought." Deputy King stated that when she arrived on the scene, appellant "was staggering, but he was charging in [Deputy Magee's] direction," that appellant had "blood shot eyes, slurry speech, [and] was unable to stand by himself." She also stated that appellant could not remember his wife's name or phone number and that "[h]e just kept going in and out. One minute, he would try to talk; and then he [would] go out whereas you couldn't hear or understand [anything] he was saying."

Subsequent field sobriety testing and evaluation by a drug recognition expert led police to believe that appellant was intoxicated, allowing them to obtain a

11

warrant for a blood sample. Appellant told Officer Ciers that he took Norco and Elavil, two central nervous system depressants, prior to driving, and the blood sample demonstrated that appellant had numerous central nervous system depressants in his system. Officer Ciers testified that the central nervous system depressants would cause someone to exhibit similar behavior to someone under the influence of alcohol: "[s]low, sluggish, disoriented, slurred speech, drunk-like behavior." Officer Ciers also stated that such drugs could stay active in someone's system, on average, for up to eight hours.

Appellant argues that even though "there is sufficient evidence to establish that [he] was intoxicated after he performed the standard field sobriety tests at the station," the State presented "no direct or circumstantial evidence to establish the temporal link between driving and intoxication." He argues that the dispatch report was not sufficient to establish that he was driving while impaired[2] and that Deputy Magee did not see him driving erratically. However, as discussed above, Deputy Magee observed appellant driving, and both he and Deputy King testified regarding appellant's condition at the time they encountered him, allowing the jury to infer that appellant was impaired at the time of the stop.

---

[2] Appellant also argues, in part, that the anonymous report relayed through dispatch was insufficient to justify his detention. However, he did not challenge his detention at trial, so he did not preserve this argument for consideration on appeal. *See* TEX. R. APP. P. 33.1(a).

Appellant also argues that "[t]he State presented evidence that [he] showed signs of intoxication at the scene but these signs were also symptoms of [his] multiple medical conditions" and that "without standard field sobriety testing, a breathalyzer or blood evidence, there was no way to differentiate [his] medical condition at the scene versus his intoxication." However, the only evidence of appellant's medical conditions was Deputy King's and Officer Ciers' testimony that appellant told them he had medical conditions, including epilepsy and Guillain-Barre syndrome. Appellant presented no expert or documentary evidence that he actually had these illnesses or that they could have caused the impairment testified to by the deputies and HPD officers.

Appellant further argues that because the field sobriety testing was conducted as much as five hours after the traffic stop and the blood test was conducted approximately seven hours after the stop, "there is no way to know whether the drugs found in [his] system [seven] hours after his arrest were sufficient to impair his driving or [were] even active at the time of driving in this case." Both Deputy Magee's and Deputy King's testimony, however, allowed the jury to infer that appellant was impaired at the time of his stop. Furthermore, appellant told Officer Ciers that he took hydrocodone before driving, and he refused to submit to a blood sample. *See* TEX. TRANSP. CODE ANN. § 724.061 (Vernon 2011) ("A person's refusal of a request by an officer to submit to the

taking of a specimen of breath or blood, whether the refusal was express or the result of an intentional failure to give the specimen, may be introduced into evidence at the person's trial."); *Bartlett*, 270 S.W.3d at 153 (recognizing defendant's refusal to submit to breath test is relevant to show consciousness of guilt). Appellant's blood test, obtained after police were able to get a warrant, demonstrated that he had marijuana, hydrocodone, and three kinds of benzodiazepines in his system approximately seven hours after his arrest. Officer Ciers testified that these drugs could cause behavior consistent with appellant's at the time of his arrest and at the time of his subsequent field sobriety tests and drug recognition evaluation, and Ciers also testified that such drugs could remain in someone's system for an average of one to eight hours after ingestion.

Viewing all of the evidence in the light most favorable to the verdict, we conclude that the jury could have found beyond a reasonable doubt that appellant operated a motor vehicle in a public place while he did not have "the normal use of [his] mental or physical faculties by reason of introduction of . . . a drug . . . or any other substance into [his] body." *See* TEX. PENAL CODE ANN. §§ 49.01(2)(A), 49.04; *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Adames*, 353 S.W.3d at 859.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Jennings, Keyes, and Bland.

Do not publish. TEX. R. APP. P. 47.2(b).