NO. 07-07-0096-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS
 
AT AMARILLO

PANEL D

MAY 8, 2008
______________________________


KEVIN DWAYNE KENNEMUR, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE


_________________________________

FROM THE 121ST DISTRICT COURT OF YOAKUM COUNTY;

NO. 2499; HONORABLE KELLY G. MOORE, JUDGE

_______________________________

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ. 


OPINION


          Appellant, Kevin Dwayne Kennemur, was convicted by a jury of intoxication
manslaughter and sentenced to forty years confinement. By three issues, Appellant
contends the evidence at trial was both (1) legally and (2) factually insufficient to support
a conviction for intoxication manslaughter; and (3) the trial court erred in denying his
motion to suppress evidence. We affirm.
Background
          Sunday evening, August 8, 2005, Appellant and Lana McLaurin drove to the Border
Bar located in New Mexico. Because the Border Bar would not accept credit cards, they
traveled to the Western Bar located approximately five miles west of the Texas-New
Mexico state line on US Highway 380. En route, they were drinking from a bottle of wine
they purchased at the Border Bar. 
          They entered the Western Bar at approximately 10:20 p.m.


 Michelle Rubio was
tending bar and preparing to close at 11:00 p.m. After learning the Western Bar accepted
credit cards, McLaurin ordered two Colorado Bulldogs and obtained quarters for the
jukebox and pool table. After Appellant finished his drink, he and McLaurin began arguing. 
McLaurin ordered another round of Colorado Bulldogs and took the drink to Appellant. 
Rubio went to the kitchen to clean and could overhear the two continuing to argue. There
were no other patrons in the bar. 
          Rubio returned from the kitchen and asked if there was a problem. Appellant
responded it was none of her “damn” business and started cursing and screaming at her. 
Rubio told them, if they continued arguing, they would have to leave. Appellant told Rubio
to leave them alone and they would handle matters themselves. Rubio told them to keep
it down and she returned to the kitchen.
          After Appellant finished his drink, McLaurin went to the kitchen to order a third round 
of drinks. When Rubio returned to the bar, Appellant was standing behind the bar with a
bottle of whiskey in hand. When Rubio confronted him, he indicated he was taking the
bottle because she had his credit card. After arguing back and forth with Rubio, he put the
bottle back. Appellant continued to argue with Rubio while McLaurin tried to calm him
down. Rubio told Appellant she was going to tab them out and they could leave. When
she went to the credit card machine, Rubio noticed her tip jar was empty. She asked
Appellant to put her tip money back, and he denied having the money. After arguing with
Rubio further, Appellant returned the money. At that time, Appellant cursed and
threatened to strike Rubio. Appellant also cursed McLaurin. Rubio was frightened and
upset. At trial she testified she had never encountered a situation like that before.
          After Rubio totaled up their tab and returned his credit card, Appellant offered to
take McLaurin home and left for his vehicle. Rubio was concerned for McLaurin’s safety
and pleaded with McLaurin to allow her to take her home. While the two stood in the
doorway of the bar, Appellant revved his Camaro’s engine repeatedly. McLaurin left the
bar and entered the vehicle from the passenger side. Before she could close her vehicle
door, Appellant put the Camaro in reverse and sped so fast he backed into the barrow
ditch in front of the bar. 
          When Appellant’s vehicle came out of the ditch, the Camaro fish-tailed sideways
across the gravel lot, ran a stop sign, and entered the highway in the wrong lane facing an
oncoming truck. Rubio was concerned there would be a wreck, however, an accident was
averted. The time was 10:50 p.m. 
          The following morning at 5:45 a.m., Appellant woke Brad Palmer at his residence
on U.S. 380, commonly known as State Line Road. Appellant told Palmer that he and his
girlfriend had been involved in an automobile accident. He indicated he had come from
the Western Bar but wasn’t sure where the accident had occurred. He stated that he had
been walking dirt roads for some time looking for help. Palmer called 911. At trial, Palmer
testified his house was located approximately thirteen miles from the Western Bar, his
house was not the closest to the scene of the accident, and the speed limit on State Line
Road was seventy miles per hour.
           Mark Traweek, an Emergency Medical Technician, responded to Palmer’s call. He 
arrived first at the scene of the accident, approximately 1.1 miles from Palmer’s residence,
and pronounced McLaurin dead on the scene. He then went to Palmer’s house. Traweek
drew three tubes of blood from Appellant at approximately 6:30 a.m. He suspected alcohol
was involved in the accident because Appellant smelled of alcohol and appeared to be in
an “altered level of consciousness.” Traweek described Appellant as very agitated, not
normal, distraught, and crying. He further testified that he believed Appellant’s behavior
indicated there was “something that caused him to be that way.” 
          At 7:05 a.m., Appellant was admitted to the Emergency Room at Yoakum County
Hospital. When he was admitted, he appeared confused, was crying, smelled of alcohol,
and had slurred speech. Appellant told a nurse that he remembered waking up on the
ground and walking several miles to get help. He did not remember the accident or how
long he had been unconscious, but recalled McLaurin was driving. At 7:30 a.m., he was
seen by Dr. Amir Menon who ordered blood tests to determine his blood alcohol content
(BAC). Menon noted that Appellant smelled as if he was probably drunk. The blood drawn
by Traweek at 6:30 a.m. was tested and yielded a serum BAC of 114, which converts to
a whole BAC of .098, or .018 above the legal limit of .08.


 
           Menon testified 114 was high, with a normal BAC being between 0 to 100. He
further testified that a normal person’s BAC should drop on the average 20 to 30 points
every couple of hours. He stated that this was the standard used by internists in the
emergency room for determining how long a patient under the influence of alcohol should
be held before being released. Thus, he testified, if a person has a serum BAC level of
114 at a particular point in time, a couple of hours earlier it might have been 200 or 150. 
He opined that Appellant’s BAC may have been as high as 184 to 194 at the time of the
accident. Based upon Appellant’s history and elevated liver enzyme level, Menon believed
Appellant had an alcohol appetite and was probably a chronic drinker. 
          At 10:03 a.m., DPS Trooper Mark Matlock visited Appellant and obtained a voluntary
statement. Appellant’s statement indicated that McLaurin was driving at the time of the
accident. Appellant told Matlock that, when they left the Western Bar, he laid his seat back
to rest and fell asleep in the passenger seat. When he woke up, the vehicle was upside
down. He shook McLaurin and she would not wake up. He pulled her from the vehicle and
went for help. He could not see well because he did not have his glasses and searched
a long time before finding Palmer’s house. Matlock testified Appellant’s breath and person
emanated a strong odor of alcoholic beverage and his eyes were red and bloodshot. 
Matlock had a mandatory blood draw taken that subsequently yielded a BAC of .03. 
          Sheila Barrientes, an acquaintance of Appellant, also visited him in the Emergency
Room between 11:00 a.m. to 12:00 p.m. She testified Appellant smelled very strongly of
alcoholic beverage, that it was “horrendous” and like “nothing that I had ever encountered.” 
          On August 23, 2005, Matlock and DPS Sergeant Mike McClure confronted Appellant
with Rubio’s statement that he was driving when the couple left the Western Bar. 
Appellant indicated it was possible he was driving when they left the bar because he
remembered that they later stopped for McLaurin to urinate. Appellant further recalled that
it was at that point they switched seats and McLaurin began driving.
          At trial, Matlock was permitted to give opinion testimony regarding intoxication and
accident reconstruction. Matlock’s investigation indicated the Camaro was traveling at a
minimum of 113 miles per hour when the vehicle skidded into the oncoming lane of traffic
and turned completely sideways before traveling backwards. At that point, the passenger
side of the vehicle dug into a narrow berm in the ditch opposite its original lane of traffic
and started to roll. The Camaro then inverted with the rear passenger side hitting a utility
pole two to three feet above the ground. The passenger side of the vehicle sustained
severe damage, while damage to the driver’s side was minimal. 
          Matlock opined that the accident occurred at 11:30 p.m., the approximate time
necessary to drive from the Western Bar to the crash site. He also opined McLaurin was
in the passenger seat at the time of the accident because she was found on the ground
just outside the passenger side and the massive damage to the passenger side of the
vehicle was consistent with her injuries. He indicated Appellant’s injuries were minimal
consistent with the damage to the driver’s side. Furthermore, Matlock testified Appellant’s
version of what occurred post-accident was inconsistent with the crash site, i.e. Appellant
could not have exited through the passenger door because it was jammed shut and there
was no evidence McLaurin’s body had been pulled from the vehicle as he had described. 
Furthermore, the passenger seat was in an upright position–not a reclined position as
described by Appellant. Matlock further opined that the cause of the accident was
Appellant’s intoxicated state, combined with vehicular speed. He based his opinion upon
Appellant’s highly agitated state leaving the Western Bar after drinking, his BAC of .098
nearly seven hours after the accident, and the strong smell of alcohol on Appellant’s breath
and person at the Palmer residence and in the Emergency Room. 
          Tim Lovett, a second expert certified in accident reconstruction, agreed with
Matlock’s analysis that Appellant was the driver at the time of the accident. Lovett also
cited McLaurin’s autopsy report as evidence that her injuries were consistent with her being
a passenger, i.e. patterned injuries that could only have come from the seat belt hanger
and/or door latch on the passenger side. In addition, the wreckage indicated that the only
exit from which McLaurin could have been ejected prior to the collision was the passenger
window. Lovett also testified Appellant’s intoxication combined with the speed of the
vehicle caused the accident that claimed McLaurin’s life. 
          John Bundy, a forensic scientist in the DPS Trace section specializing in shoe prints,
tested the Camaro’s brake and accelerator pedals for shoe prints. Using oblique lighting
and alternative lighting, Bundy was able to detect a dust impression on the brake pedal
identical to the tread design on Appellant’s shoes. He testified the dust impression was
very fragile and could be easily obliterated by an overlapping impression or someone else
putting their foot on the brake. He found nothing on either the gas or brake pedal similar
to the pattern on McLaurin’s sandals. However, without the presence of accidentals, i.e.
microscopic scratches, stone holes, or nicks making the pattern unique, he could not testify
that the shoe print on the brake pedal was, in fact, made by Appellant’s shoe. 
          Thomas Beaver, forensic pathologist and Chief Medical Examiner in Lubbock,
opined that in the period of time between 11:30 p.m. and 6:30 a.m., Appellant’s stomach
would have emptied its contents completely and Appellant would have been in a post-absorptive stage. Beaver testified that whenever a person is in a post-absorptive stage
their liver begins to eliminate alcohol from the blood, thereby causing their BAC to fall over
time. The range established for individuals to metabolize alcohol on an hourly basis is
generally considered to be .015 to .025 per hour depending on a number of factors such
as body size and metabolic rate. Based on this information, Beaver concluded that
because Appellant was in a post-absorptive stage with a BAC of .098 at 6:30 a.m., he
would have had a higher BAC at an earlier time. 
          Beaver also agreed with Matlock and Lovett that McLaurin was seated in the
passenger seat at the time of the wreck. He testified her cause of death was multiple
trauma consistent with her being a passenger. The most important factor for Beaver was
her spinal fractures which he described as a “hallmark of being ejected from the vehicle.” 
He also testified McLaurin’s BAC was .032 and she had two hundred fifty milliliters of urine
in her bladder. He considered this amount of urine to fill at least half the capacity of her
bladder which would have prompted her to empty her bladder. Once started, he opined
it would have been difficult for her to stop urinating because her bladder was distended at
two hundred fifty milliliters. A person might be able to stop at fifty or twenty-five milliliters
but, at two hundred fifty milliliters, the bladder would want to continue emptying. He further
opined that, typically, he would not expect to see that much urine in her body at time of
death. 
Discussion
          Appellant contends the State’s evidence at trial was legally insufficient to prove he
was intoxicated at the time of the accident under either an impairment or per se theory of
intoxication. Alternatively, he asserts the evidence is factually insufficient to support his
conviction.


 Finally, Appellant contends the trial court erred in its denial of his motion to
suppress his blood alcohol test results and medical records for treatment administered by
Yoakum County Hospital on August 9 and 10, 2005. He contends their release violated
federal privacy guarantees under the Health Insurance Portability and Accountability Act
of 1996 (HIPAA).


 Logic dictates we consider Appellant’s third issue regarding the
suppression of evidence first–before we determine the legal and factual sufficiency of the
evidence. 
          I. Motion to Suppress
          Appellant contends the trial court erred by permitting the State to put into evidence
his medical records and blood alcohol test results obtained pursuant to a subpoena duces
tecum issued to the custodian of records at the Yoakum County Hospital. Appellant
asserts the evidence was obtained in violation of HIPAA’s Privacy Rule because the
subpoena was neither a grand jury subpoena nor a subpoena issued by a judicial officer. 
See 45 C.F.R. § 164.512(f)(1)(ii) (2008).



          There is no Fourth Amendment reasonable expectation of privacy protecting blood
alcohol test results from tests taken by hospital personnel solely for medical purposes after
a traffic accident. State v. Hardy, 963 S.W.2d 516, 527 (Tex.Crim.App. 1997). The Hardy
rule applies in instances where the accused challenges the State’s use of his or her
medical records at trial due to an alleged HIPAA violation. See Murray v. State, 245
S.W.3d 37, 42 (Tex.App.–Austin 2007, pet. filed); Tapp v. State, 108 S.W.3d 459, 461-62
(Tex.App.–Houston 2003, pet. ref’d). Because Appellant has no constitutional or statutory
reasonable expectation of privacy with respect to blood alcohol test results obtained solely
for medical purposes following an accident, he has no standing to complain that the State
obtained his medical records in violation of HIPAA. See Ramos v. State, 124 S.W.3d 326,
338-39 (Tex.App.–Fort Worth 2003, pet. ref’d). 
          We are mindful that a “standard, requirement or implementation specification”
adopted under the Privacy Rule generally preempts contrary state laws. Murray, 245
S.W.3d at 42 (citing 45 C.F.R. § 160.203). Nevertheless, we are constrained to follow
existing law under Hardy absent any guidance or instructions to the contrary from the Court
of Criminal Appeals. Id.; Tapp, 108 S.W.3d at 463. That said, HIPAA requirements for
disclosure conform with the holding in Hardy as follows:
A covered health care provider providing emergency health care in response
to a medical emergency . . . may disclose protected health care information
to a law enforcement official if such disclosure appears necessary to alert
law enforcement to: (A) The commission and nature of a crime; (B) The
location of such crime or of the victim(s) of such crime; and (C) The identity,
description, and location of the perpetrator of such crime.
 
45 C.F.R. § 164.512(f)(6)(I).
 
          Moreover, under the provision relied upon by Appellant, his medical information was
also properly disclosed per the subpoena duces tecum. Under § 164.512(f)(1)(i), a
covered entity may disclose protected health information for law enforcement purposes to 
a law enforcement official if the disclosure is “[p]ursuant to process”


 and is as “required
by law.”


 Here, the subpoena was issued at the request of the Criminal District Attorney
for law enforcement purposes. The subpoena required the custodian of records to appear
in the 121st District Court with the requested documents, and non-compliance was subject
to a fine not exceeding five hundred dollars. See also Tex. Code Crim. Proc. Ann. arts.
24.01-06 (Vernon Supp. 2007). Accordingly, because the trial court committed no error
in admitting Appellant’s medical information, issue three is overruled.  
          II.       Legal Sufficiency of the Evidence
          When conducting a legal sufficiency review of the evidence to support a criminal
conviction, we view the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 61
L.Ed.2d 560 (1979); Drichas v. State, 175 S.W.3d 795, 798 (Tex.Crim.App. 2005). We do
not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any
witnesses, as this is the function of the trier of fact. See Dewberry v. State, 4 S.W.3d 735,
740 (Tex.Crim.App. 1999). Instead, we determine whether both the explicit and implicit
findings of the trier of fact are rational by viewing all the evidence admitted at trial in the
light most favorable to the adjudication. Adelman v. State, 828 S.W.2d 418, 422
(Tex.Crim.App. 1992). In so doing, we resolve any inconsistencies in the evidence in favor
of the adjudication. Matson v. State, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). 
          Each fact need not point directly and independently to the guilt of the appellant, as
long as the cumulative force of all the incriminating circumstances is sufficient to warrant
the conviction. Hooper v. State, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Circumstantial
evidence is as probative as direct evidence in establishing an accused’s guilt, and
circumstantial evidence alone can be sufficient. Id. On appeal, the same standard of
review is used for both circumstantial and direct evidence cases. Id. 
          A person commits the offense of intoxication manslaughter if the person: (1)
operates a motor vehicle in a public place; (2) is intoxicated, and (3) by reason of that
intoxication, (4) causes the death of another by accident or mistake. Tex. Penal Code Ann.
§ 49.08(a) (Vernon Supp. 2007). A person is considered “intoxicated” if the person: (1)
does not have the normal use of their mental or physical faculties by reason of the
introduction of alcohol into the body; or (2) has an alcohol concentration of 0.08 or more. 
Tex. Penal Code Ann. § 49.01(2) (Vernon 2003). Thus, there are two alternative means
or theories by which the State can prove intoxication, i.e. impairment of the use of normal
mental or physical faculties and/or per se. Bagheri v. State, 119 S.W.3d 755, 762
(Tex.Crim.App. 2003). 
          Evidence of the appellant’s appearance, condition, and actions; Mercer v. State, 143
Tex. Crim. 196, 157 S.W.2d 919, 920 (1941), the manner in which the appellant managed
his vehicle; Sanchez v. State, 398 S.W.2d 117 (Tex.Crim.App. 1966)(speed prior to
collision probative); Allen v. State, 149 Tex. Crim. 612, 197 S.W.2d 1013 (1946)(speed and
force of collision relevant); Allcott v. State, 158 S.W.3d 73, 75 (Tex.App.–Houston [14th
Dist.] 2005, no pet.), and the victim’s injuries; Etheridge v. State, 903 S.W.2d 1, 14
(Tex.Crim.App. 1994), may comprise circumstantial evidence of the fact of intoxication and
a causal connection with the death of the deceased. 
          Taken in the light most favorable to the verdict, the evidence at trial showed
Appellant was drinking prior to the accident, was behaving in an irrational and threatening
way, and he drove away from the Western Bar in a reckless manner. When the accident
occurred,


 Appellant was driving


 at more than one hundred thirteen miles per hour and he
lost control of his vehicle on a straight stretch of roadway with no obstructions. His vehicle
left the roadway and became airborne ultimately striking a utility pole on the passenger
side. The victim was ejected from the passenger side of the vehicle. As a result of the
accident, McLaurin sustained severe injuries resulting in her death.
          Approximately seven hours after the accident, Appellant tested over the legal limit
for alcohol consumption with a .098 BAC. EMT Traweek testified Appellant smelled of
alcoholic beverage and was very agitated, not normal, distraught, crying, and believed
Appellant’s behavior exhibited “an altered state of consciousness.” An hour later at the
Emergency Room, the ER doctor noticed Appellant smelled as if he were drunk, ordered
blood tests, and treated him for alcohol abuse in addition to minor injuries. Approximately,
two hours later, Appellant continued to emit a strong odor of alcohol. Based upon the
evidence of his drinking, erratic behavior, and reckless driving prior to the accident, the
extreme recklessness with which the accident occurred, the damage to the vehicle, the
victim’s injuries, and the post-accident aroma of alcohol on Appellant’s person, the jury
could have inferred and rationally found that Appellant operated a motor vehicle in a public
place while intoxicated, and that by reason of that intoxication caused the death of another
by accident or mistake. See Hale v. State, 194 S.W.3d 39, 40 (Tex.App.–Texarkana 2006,
no pet.)(driving while intoxicated at a high rate of speed cannot possibly be characterized
as being insufficient conduct to cause an accident); Martinez v. State, 66 S.W.3d 467, 470
(Tex.App.–Houston [1st Dist.] 2001, pet. ref’d). 
          Moreover, Appellant’s appearance and blood alcohol test, although taken hours
after the accident occurred, tend to make it more probable that he was intoxicated at the
time of the collision because they provided evidence that he had introduced alcohol into
the body prior to the accident. See Stewart, 129 S.W.3d at 96-97. In the absence of any
evidence Appellant consumed alcohol after leaving the Western Bar or following the
accident, Appellant’s intoxicated state at the time his blood was taken by EMT Traweek at
6:30 a.m. on Monday could only have arisen from drinking prior to his departure from the
Western Bar at 10:50 p.m. on Sunday. Thus, it follows that Appellant must have been
intoxicated within the time periods which included the time the accident occurred. See
Zavala v. State, 89 S.W.3d 134, 140 (Tex.App.–Corpus Christi 2002, no pet.); Purvis v.
State, 4 S.W.3d 118, 119, 121-22 (Tex.App.--Waco 1999, no pet.).  
          Appellant’s reliance on Leal v. State, 170 Tex. Crim. 71, 338 S.W.2d 443 (1960),
is misplaced. In Leal, appellant struck a motorcyclist around 8:00 a.m. after eating and
drinking at an establishment until 5:30 - 6:00 a.m. Witnesses at the accident scene
indicated appellant was not intoxicated, did not smell of alcoholic beverage, and could not
testify when appellant had been drinking. Id. at 443-444. A urine specimen taken at 9:35
a.m. yielded a BAC of .12. Id. at 445. A chemist testified “[i]t would be possible . . . for an
individual whose urine showed .15 alcohol to have as little as .04 percent alcohol in his
blood, at which level no person is intoxicated.” Id. The Court also described the expert
testimony as equivocal indicating appellant was “probably intoxicated,” or “had been
drinking,” or was a “border line” case of intoxication. Id. at 446. Based upon the evidence,
the Leal Court held that the State’s evidence was legally insufficient to show appellant was
intoxicated at the time of the collision. Id.
          Here, unlike Leal, there is evidence of drinking, irrational and threatening behavior,
and reckless driving before the accident. Unlike Leal, there is also evidence Appellant’s
driving was extremely reckless prior to the collision with the utility pole, damage to the
vehicle was substantial, and the victim’s injuries were numerous and fatal. Hours
afterwards, in the absence of any evidence indicating Appellant ingested any alcoholic
beverage since leaving the bar, Appellant’s BAC was .098 and he smelled of alcohol. 
Later yet, he continued to smell strongly of alcohol. Furthermore, unlike Leal, the State’s
expert evidence on intoxication in this case was not equivocal. Thus, Leal is inapposite. 
           Accordingly, we find that a factfinder could reasonably have found Appellant
operated his motor vehicle at a time when he did not have the “normal use” of his mental
or physical faculties or when he had an alcohol concentration of .08 or more and, “but for”
his intoxication, the victim’s death would not have occurred. Appellant’s first issue is
overruled.
III.      Factual Sufficiency of the Evidence
          When conducting a factual sufficiency review, we examine all the evidence in a
neutral light and determine whether the trier of fact was rationally justified in finding guilt
beyond a reasonable doubt. Roberts v. State, 220 S.W.3d 521, 524 (Tex.Crim.App.), cert.
denied, ___ U.S. ___,128 S.Ct. 282, 76 U.S.L.W. 3165 (2007); Watson v. State, 204 S.W.
3d 404, 415 (Tex.Crim.App. 2006). We are to give deference to the factfinder’s
determination if supported by the record, and cannot reverse a conviction unless we find
some objective basis in the record that demonstrates that the great weight and
preponderance of the evidence contradicts the verdict. Id. at 417. The criminal verdict will
be set aside “only if the evidence is so weak that the verdict is clearly wrong and manifestly
unjust, or the contrary evidence so strong that the standard of proof beyond a reasonable
doubt could not have been met.” Garza v. State, 213 S.W.3d 338, 343 (Tex.Crim.App.
2007). In addition, we must include a discussion of the most important evidence that the
appellant claims undermines the verdict. Sims v. State, 99 S.W.3d 600, 603
(Tex.Crim.App. 2003).
          Appellant contends the evidence is factually insufficient to support his conviction
because: (1) his BAC of .098 was an unreliable indicator of intoxication because the blood
sample was obtained seven hours after the accident; (2) Rubio testified he was not
intoxicated when he drove away from the Western Bar; (3) he scored well on the Glasgow
Coma test near to the time his blood sample was taken; and (4) EMT Traweek
contaminated his blood sample by wiping Appellant’s arm with an alcohol wipe prior to
taking the blood sample. Appellant also asserts the State’s evidence of intoxication at the
time of the accident was insufficient because the State did not produce an expert who
could reliably quantify Appellant’s BAC at the time of the accident by retrograde
extrapolation


 due to unknown variables. Additionally, Appellant asserts that the results
of the blood test may have been skewed if he were in an absorption stage. 
          The BAC results of the blood draw taken by EMT Traweek are probative of
Appellant’s intoxication at the time of the accident even in the absence of any retrograde
extrapolation. State v. Melcher, 153 S.W.3d 435, 440 (Tex.Crim.App. 2005); Stewart v.
State, 129 S.W.3d 93, 97 (Tex.Crim.App. 2004); Letner v. State, 138 S.W.3d 539, 541
(Tex.App.–Beaumont 2004, no pet.). Furthermore, under an impairment theory, the State
need not prove the defendant’s exact BAC at the time of the accident. See Jackson v.
State, 50 S.W.3d 579, 588 (Tex.App.–Fort Worth 2001, pet. ref’d). 
          The State’s expert, Beaver, acknowledged the difficulties in conducting a retrograde
extrapolation due to the time-lag between when the accident occurred and Appellant’s
blood draw for testing purposes. Nevertheless, he did testify that, while he could not give
an exact measurement of Appellant’s BAC at the time of the accident, he was comfortable
opining that, if a person had a blood alcohol level of .098 at 6:30 a.m., that person’s BAC
would have been higher still at an earlier time. He indicated that, while it was difficult to
assign a specific number to the increase in BAC, he didn’t believe anyone would disagree
with a range of .015 to .025 per hour. Menon, the ER doctor who treated Appellant, also
testified that Appellant’s blood alcohol level would have been higher at the time of the
accident based upon a standard measurement used by internists in the Emergency Room. 
Appellant offered no evidence to rebut these opinions.
          Beaver also testified that too many hours had passed between the estimated time
of the accident, 11:30 p.m. on Sunday, and the time of the blood draw the next morning, 
6:30 a.m. on Monday, for Appellant to be in an absorptive stage. In fact, he testified there
was “no chance.” He further testified that, given this passage of time, Appellant had to be
“post-absorptive, which means that his blood alcohol has to be falling over time.” Appellant
offered no evidence to rebut these opinions. If Appellant had produced evidence showing
his BAC actually increased or of factors that could lead to that result, “the question of lag-time between driving and the test becomes a matter to be weighed by the jury.” Garcia v.
State, 112 S.W.3d 839, 851 (Tex.App.–Houston [14th Dist.] 2003, no pet.). Given the
State’s evidence in support of the jury’s finding that Appellant was intoxicated at the time
of the accident and the absence of evidence in rebuttal by Appellant, we cannot say the
verdict is clearly wrong or manifestly unjust.
          Neither does Rubio’s testimony indicating Appellant was not intoxicated when he
left the Western Bar, EMT Traweek’s wiping of Appellant’s arm with an alcohol wipe prior
to taking the blood sample, and/or Appellant’s score on the Glasgow Coma test near to the
time his blood sample was taken, constitute a “great weight or preponderance of evidence”
in contradiction of the jury’s verdict. Jurors being the exclusive judges of the facts and
weight to be given testimony were free to believe the State’s witnesses and evidence rather
than Rubio or the results of Appellant’s Glasgow Coma test on the issue of Appellant’s
intoxicated state. See Matula v. State, 972 S.W.2d 891, 893 (Tex.App.–Corpus Christi
1998, no pet.). 
          Furthermore, the use of a cleansing solution containing alcohol in connection with
a blood test is merely a factor to be weighed by the jury. Kaufman v. State, 632 S.W.2d
685, 687-88 (Tex.App.–Eastland 1982, pet. ref’d). Although Matlock testified that it was
not his practice to use alcohol preps or swabs when taking a blood draw, Traweek testified
that the alcohol from the wipe would have evaporated prior to the needle being inserted
for the blood draw. Beaver corroborated Traweek’s testimony and opined that the alcohol
swipe would not affect the accuracy of the test. Thus, we defer to the factfinder since the
determination is supported by the record.
          Accordingly, we find that the evidence was factually sufficient because the verdict
was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust. Because the evidence was factually sufficient to support a finding that Appellant’s
intoxication caused the victim’s death, we overrule his second issue as well. Conclusion
 
          Having overruled all of Appellant’s issues, we affirm the trial court’s judgment.
 
 
                                                                                      Patrick A. Pirtle                                                                                                  Justice 
 
Publish.