PD-0544&0545-16
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 6/20/2016 12:00:00 AM
Accepted 6/21/2016 2:41:52 PM
ABEL ACOSTA
CLERK

# Nos. PD-0545-16 and PD-0546-16

---

IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

## MATTHEW RYAN ARBANAS
*Appellant*

v.

## STATE OF TEXAS
*Appellee*

---

Court of Appeals of Texas, Fifth District
Case Nos. 05-14-01376-CR and 05-14-01377-CR

219th Judicial District Court, Collin County
Cause Nos. 219-82622-2012 and 219-82623-2012

---

## APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

---

MATTHEW J. KITA
Texas Bar No. 24050883

P.O. Box 5119
Dallas, Texas 75208
(214) 699-1863 (phone)
(214) 347-7221 (facsimile)
matt@mattkita.com

COUNSEL FOR APPELLANT

FILED IN
COURT OF CRIMINAL APPEALS

June 21, 2016

ABEL ACOSTA, CLERK

Oral Argument Requested

## Identity of Judge, Parties, and Counsel

| | |
|---|---|
| **Trial Judge:** | **Hon. Scott J. Becker** |
| | 219th Judicial District Court |
| | Collin County, Texas |
| | |
| **Appellant:** | **Matthew Ryan Arbanas** |
| | |
| Appellate Counsel: | Matthew J. Kita |
| | P.O. Box 5119 |
| | Dallas, Texas 75208 |
| | |
| Trial Counsel: | Phillip Hayes |
| | 3300 Oak Lawn Avenue |
| | Dallas, Texas 75219 |
| | |
| **Appellee:** | **State of Texas** |
| | |
| Appellate Counsel: | Emily Johnson-Liu |
| | Collin County District Attorney's Office |
| | 2100 Bloomdale Road |
| | McKinney, Texas 75071 |
| | |
| Trial Counsel: | Cynthia Walker |
| | Geetangali Singletary |
| | Collin County District Attorney's Office |
| | 2100 Bloomdale Road |
| | McKinney, Texas 75071 |

# TABLE OF CONTENTS

Identity of Judge, Parties, and Counsel ...................................................................i

Index of Authorities ....................................................................................iii

Statement Regarding Oral Argument.........................................................v

Statement of the Case .................................................................................vi

Statement of Procedural History................................................................vii

Questions Presented for Review ...............................................................viii

Argument .....................................................................................................1

I.      This Court should adopt the majority interpretation of the double-jeopardy clause, and prohibits the State from charging the jury on multiplicitous offenses. ...........................................................................................1

II.     This Court should require the State to sponsor a witness who can provide a scientific explanation for the reliability of machine-generated, non-forensic medical records. ........................................................................................5

III.    This Court should confirm that Texas Rule of Evidence 705 does not require expert witnesses to disclose *all* of their opinions during their initial voir dire examination.............................................................................................8

Conclusion and Prayer ...............................................................................11

Certificate of Compliance ..........................................................................12

Certificate of Service..................................................................................12

# INDEX OF AUTHORITIES

## CASES

*Ball v. United States*,
470 U.S. 856 (1985) ........................................................................................3, 4

*Cichos v. Indiana*,
385 U.S. 76 (1966) ............................................................................................3

*Ervin v. State*,
991 S.W.2d 804 (Tex. Crim. App. 1999) ........................................................ 1, 4

*Kelly v. State,*
824 S.W.2d 568 (Tex. Crim. App. 1992)...........................................................6

*Stanley v. State*,
No. 14-11-00679-CR, 2012 WL 4848762
(Tex. App.—Houston [14th Dist.] Oct. 9, 2012, no pet.) ..................................6

*Thornton v. State*,
37 S.W.3d 490 (Tex. App.—Texarkana 2000, pet. ref'd) ..................................8

*United States v. Anderson*,
39 F.3d 331 (D.C. Cir. 1994)............................................................................2

*United States v. Clarridge*,
811 F. Supp. 697 (D.D.C. 1992) ......................................................................2

*United States v. Duncan*,
850 F.2d 1104 (6th Cir. 1988)..........................................................................2

*United States v. Emly*,
747 F.3d 974 (8th Cir. 2014) ...........................................................................2

*United States v. Hinojosa*,
No. 2:14-CR-00038-RWS, 2015 WL 999893 (N.D. Ga. Mar. 6, 2015) ...............2

*United States v. Johnson*,
130 F.3d 1420 (10th Cir. 1997) ........................................................................2

*United States v. Morrow*,
No. 04-CR-355-01, 2015 WL 1955462 (D.D.C. Apr. 30, 2015) ...........................2

*United States v. Reed*,
639 F.2d 896 (2d Cir. 1981) .................................................................2

*United States v. Williams*,
527 F.3d 1235 (11th Cir. 2008)). .........................................................2

## Rules

Tex. R. Evid. 705 ......................................................................................9

## Constitutional Provisions

U.S. Const. amend. V ................................................................................1

## STATEMENT REGARDING ORAL ARGUMENT

This petition presents three issues of first impression for this Court, namely, (a) whether the double-jeopardy clause bars trials of multiplicitous offenses; (b) the State's evidentiary burden when seeking to admit non-forensic data; and (c) the proper procedure for disclosing and challenging expert opinions elicited for the first time during trial. Because these issues will necessarily turn on detailed analysis of case law and public policy concerns, Appellant respectfully submits that oral argument will aid the court in its analysis.

## Statement of the Case

**Nature of the Case:**     Arbanas was charged with three felony offenses in two indictments. In the first indictment, he was charged with intoxication manslaughter and manslaughter.[1] In the second indictment, he was charged with failure to stop and render aid following a motor-vehicle accident resulting in death.[2]

**Course of Proceedings:**     A jury convicted Arbanas on all three offenses,[3] and sentenced him to 18 years imprisonment with a $10,000 fine for the intoxication manslaughter and manslaughter offenses,[4] and 10 years imprisonment with a $10,000 fine for the failing-to-stop-and-render-aid offense.[5] Following the jury's announcement of its punishment verdict, but before the trial court signed its judgment, the State abandoned the manslaughter count.[6]

**Disposition:**     The trial court signed judgments sentencing Arbanas to 18 years imprisonment for intoxication manslaughter and 10 years imprisonment for failure to stop and render aid, with the sentences to run concurrently.[7] It also ordered Arbanas to pay a $10,000 fine in each case and all costs of court.[8] The court of appeals affirmed the judgments.

---

[1] C.R. (82622) 18–19.

[2] C.R. (82623) 14.

[3] C.R. (82622) 188–89; C.R. (82623) 101.

[4] C.R. (82622) 195–96.

[5] C.R. (82623) 107.

[6] 10 R.R. 8:20–23; 11:3–4.

[7] 10 R.R. 11:9–18; 12:15–17; C.R. (82622) 197; C.R. (82623) 109.

[8] 10 R.R. 11:18–19; C.R. (82622) 197; C.R. (82623) 109.

## STATEMENT OF PROCEDURAL HISTORY

The court of appeals issued its opinion and judgment on April 20, 2016. On May 18, 2016, Appellant timely filed a motion in this Court to extend his deadline to file this Petition by thirty days. This Court granted the motion and extended Appellant's deadline to today, June 20, 2016.

## QUESTIONS PRESENTED FOR REVIEW

1.      Although this Court recently held that manslaughter and intoxication manslaughter are "the same offense" for double-jeopardy purposes, the courts below permitted the jury to convict and sentence Appellant for both offenses, and then accepted the State's "abandonment" of its manslaughter count before signing the judgment. A majority of federal courts have held that this practice is unconstitutional because it may have a psychological effect that improperly prejudices a jury. Should Texas also prohibit this practice?

2.      The hospital that treated Appellant analyzed a sample of his blood using a non-forensic test. At trial, the State's witnesses admitted that they were not qualified to testify about the scientific principles behind this technique that produced the test results. There is no dispute that such admissions would render these witnesses unqualified to support the admission of forensic blood testing. Should Texas law impose the same reliability standards for non-forensic data as it does for forensic data?

3.      The trial court granted the State's request for a Rule 705 hearing on one of Appellant's experts. The State then asked him questions on cross-examination that went beyond the scope of the topics covered at the hearing. When Appellant attempted to elicit testimony on the same topic during redirect, the trial court refused to allow him to answer, concluding that *all* of the expert's opinions had to have been disclosed in the initial Rule 705 hearing. The court of appeals affirmed, applying a previously unused balancing test to determine if a second hearing was warranted. Given that these requirements are not stated in the rule itself, did the Courts below err in their interpretation of it?

# ARGUMENT

**I.**     **This Court should adopt the majority interpretation of the double-jeopardy clause, and prohibits the State from charging the jury on multiplicitous offenses.**

This Court should grant this petition to address an issue of first impression, namely, whether charging a jury on multiplicitous offenses violates the Fifth Amendment's double-jeopardy clause.[9] In its 1999 opinion in *Ervin v. State*, this Court held that manslaughter and intoxication manslaughter are the same offense for double-jeopardy purposes when they involve the same victim.[10] Notwithstanding this holding, the trial court permitted the State to try Appellant for both offenses, submit both offenses to the jury, and obtain convictions on both offenses.[11] Although the trial court eventually accepted the State's "abandonment" of its manslaughter conviction,[12] it cannot be disputed that it put Appellant "in jeopardy" of bring convicted twice for the same offense. Appellant argued to both the trial court and the court of appeals that this action does not cure the potential harms that its error imposed, but the court of appeals concluded, "Even if the State

---

[9] U.S. Const. amend. V ("…nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb…").

[10] *Ervin v. State*, 991 S.W.2d 804 (Tex. Crim. App. 1999).

[11] 8 R.R 10:16–20:8; C.R. (82622) 188–89, 195–96; C.R. (82623) 101, 107.

[12] 10 R.R. 8:20–23; 11:3–4.

may obtain some strategic advantage by prosecuting the defendant under multiple statutes, this advantage does not rise to the level of a constitutional violation."[13]  In so holding, the court of appeals created a conflict between state and federal law.

The court of appeals holding on this issue is based solely on two footnotes from the Supreme Court's 1985 opinion in *Ball v. United States*.[14] Since *Ball* was decided, however, federal courts throughout the country have been critical of the practice of charging a jury on multiplicitous offenses. These courts have recognized that doing so may have a psychological effect that improperly prejudices a jury by suggesting that a defendant has committed not one but several crimes,[15] unfairly increasing a defendant's exposure to criminal sanctions,[16] giving the jury numerous opportunities to convict the defendant for the same offense,[17] and increasing the risk that the jury will be diverted from a careful analysis of the conduct at issue.[18]

---

[13] Opinion, p. 6.

[14] *Ball v. United States*, 470 U.S. 856, 860 nn. 7 & 8 (1985).

[15] *See, e.g.*, *United States v. Morrow*, No. 04-CR-355-01, 2015 WL 1955462, at *8 (D.D.C. Apr. 30, 2015); *United States v. Emly*, 747 F.3d 974, 980 (8th Cir. 2014); *United States v. Johnson*, 130 F.3d 1420, 1426 (10th Cir. 1997); *United States v. Duncan,* 850 F.2d 1104, 1108 n. 4 (6th Cir. 1988); *United States v. Reed*, 639 F.2d 896, 904 (2d Cir. 1981).

[16] *See, e.g.*, *Morrow*, 2015 WL 1955462 at *8 (citing *United States v. Anderson*, 39 F.3d 331, 353–54 (D.C. Cir. 1994), rev'd en banc, 59 F.3d 1323 (D.C. Cir. 1995) (en banc)

[17] *See, e.g.*, *United States v. Hinojosa*, No. 2:14-CR-00038-RWS, 2015 WL 999893, at *7 (N.D. Ga. Mar. 6, 2015) (citing *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008)).

[18] *See, e.g.*, *United States v. Clarridge*, 811 F. Supp. 697, 702 (D.D.C. 1992).

In other words, the prevailing view of the double-jeopardy clause among federal courts today is *not* the dicta from *Ball*'s majority opinion that the court of appeals followed, but rather, it is the reasoning expressed by Justice Stevens in his concurring opinion to that same case:

> I see no reason why this Court should go out of its way to encourage prosecutors to tilt the scales of justice against the defendant by employing such tactics. …When multiple charges are brought, the defendant is 'put in jeopardy' as to each charge. To retain his freedom, the defendant must obtain an acquittal on all charges; to put the defendant in prison, the prosecution need only obtain a single guilty verdict. The prosecution's ability to bring multiple charges increases the risk that the defendant will be convicted on one or more of those charges. The very fact that a defendant has been arrested, charged, and brought to trial on several charges may suggest to the jury that he must be guilty of at least one of those crimes. Moreover, where the prosecution's evidence is weak, its ability to bring multiple charges may substantially enhance the possibility that, even though innocent, the defendant may be found guilty on one or more charges as a result of a compromise verdict. The submission of two charges rather than one gives the prosecution 'the advantage of offering the jury a choice-a situation which is apt to induce a doubtful jury to find the defendant guilty of the less serious offense rather than to continue the debate as to his innocence.'[19]

But because Texas courts permit this practice, the State is able to ask the trial court to commit plain error that can potentially work to its advantage, and the trial court can then absolve itself of the error simply by allowing the State to "abandon" one

---

[19] *Ball v. United States*, 470 U.S. 856, 867–68 (1985) (Stevens, J, concurring) (citing *Cichos v. Indiana*, 385 U.S. 76, 81 (1966) (Fortas, J., dissenting from dismissal of certiorari)).

of the charges.[20] The defendant, in the meantime, has no remedy because he cannot show any harm by the time the case is subject to appellate review. As Justice Stevens correctly noted, however, the purpose of the double-jeopardy prohibition is to protect the *accused*. Permitting the charge-and-abandon practice effectively guts these protections, while giving the State an easier path to securing a conviction, effectively turning the Fifth Amendment on its head.

In sum, by addressing the merits of this Constitutional issue in his favor, this Court can ensure that trial courts and prosecutors throughout this State honor both the letter and the spirit of this Court's holding in *Ervin*. Put otherwise, in the absence of an *actual* remedy, *Ervin* is simply dicta—providing a passing reference to a frowned-upon practice, without doing anything more than frowning. This Court, therefore, should take the bold step of discouraging such procedural chicanery and protecting the Constitutional rights of the accused by vacating Arbanas's conviction for intoxication manslaughter and rendering a judgment of acquittal.

---

[20] Unlike in *Ball*—where the statutes at issue had not previously been determined to constitute "the same offense" for double-jeopardy purposes, 470 U.S. at 859, the State and the trial court were both aware well aware that this Court had already addressed this very issue for exactly the same offenses. *Ervin*, 991 S.W.2d at 817; 8 R.R 10:16–20:8.

**II.     This Court should require the State to sponsor a witness who can provide a scientific explanation for the reliability of machine-generated, non-forensic medical records.**

This Court should grant this petition for discretionary review to clarify the State's evidentiary burden when it seeks to use data from non-forensic medical records as proof of a defendant's guilt. Here, the trial court excluded the State's forensic blood test, having concluded that the blood was acquired as part of an unreasonable seizure,[21] but admitted the results of a non-forensic test, without requiring a sponsoring witness who was qualified to opine on its reliability.[22] By affirming this practice, the court of appeals has provided the State with incentive to obtain convictions using *less* reliable evidence, while simultaneously preventing defendants from challenging that evidence with effective cross-examination. Appellant respectfully submits that such a result is contrary to the fundamental goals of the criminal justice system, and warrants this Court's review.

In its seminal 1992 opinion in *Kelly v. State*, this Court held that in order for scientific testimony to be considered "reliable," (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the

---

[21] C.R. (82622) 150.

[22] *See* 7 R.R. 130:21–131:6 ("Nobody in forensic work considers [EMIT] reliable for forensic work. It's a medical test. But in a forensic test, when you're not constrained by time, you give up time to get accuracy.").

technique must have been properly applied on the occasion in question.[23] And four years ago, this Court held in *Somers v. State* that the blood test at issue in this case—the enzyme-multiplied immunoassay technique (EMIT)— has a sufficiently sound basis in scientific methodology to satisfy the first two prongs of the *Kelly* test. It specifically reaffirmed, however, that "the third *Kelly* prong must necessarily be decided on a case-by-case basis."[24]

With regard to the third prong of the *Kelly* analysis, the Fourteenth Court of Appeals held in its 2012 opinion in *Stanley v. State* that the State has the same burden when it seeks the admission of blood-test results as it does when it seeks the admission of breath-test results:

> The necessary predicate that the State must prove for admission of such evidence is the use of properly compounded chemicals; the existence of periodic supervision over the machine used; operation by one who understands the scientific theory of the machine; and proof of the result of the test by a witness or witnesses qualified to translate and interpret such results so as to eliminate hearsay.[25]

---

[23] *Kelly v. State,* 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

[24] *Somers*, 368 S.W.3d at 537 (citing *Hartman v. State,* 946 S.W.2d 60, 64 (Tex. Crim. App. 1997)).

[25] *Stanley v. State*, No. 14-11-00679-CR, 2012 WL 4848762, at *4 (Tex. App.—Houston [14th Dist.] Oct. 9, 2012, no pet.).

Notwithstanding this requirement, both of the State's sponsoring witnesses in this case admitted that they did not understand that they understand the scientific theory of the instrument.[26] Accordingly, when Appellant attempted to undermine the reliability of the EMIT data before and during trial, he was unable to do so because neither of the State's witnesses could answer his questions. Instead, all they could do was bolster the credibility of the instrument that performed the testing, while lacking any capacity to acknowledge its weaknesses.[27]

For obvious reasons, the reliability of the State's evidence is of paramount importance to the criminal-justice system. Accordingly, given the fact that non-forensic data is inherently less reliable than forensic data, Appellant asks this Court to grant this petition for discretionary review, and hold that that the State's sponsoring witnesses for the former must be as qualified—if not more so—as its witnesses for the latter.

---

[26] 5 R.R. 161:13–162:3; 216:17–217:4; 6 R.R.

[27] *See* 5 R.R. 169:8–10 (Jones described the machine by saying, "It's wonderful.")

**III.** **This Court should confirm that Texas Rule of Evidence 705 does not require expert witnesses to disclose *all* of their opinions during their initial voir dire examination.**

The trial court and court of appeals erroneously concluded that concerns for judicial efficiency trump an accused's right to present expert testimony on an issue first raised by the State during cross-examination. Because their decisions are contrary to the text of the Rules of Evidence or in the common law interpreting same, this Court should grant this petition for discretionary review to clarify the procedure by which new expert opinions may be disclosed and challenged during trial.

As this Court is certainly well-aware, a trial court in criminal cases generally cannot order discovery of the defendant's witnesses,[28] and it certainly did not do so in this case. Accordingly, Appellant had no duty to "disclose" his expert's opinions until trial, and the State's ability to challenge the opinions of a defendant's expert is governed by Rule 705. At the time of the trial in this case,[29] Texas Rule of Evidence 705(b) provided:

> Prior to the expert giving the expert's opinion or disclosing the underlying facts or data, *a party against whom the opinion is offered* upon request in a criminal trial shall…be permitted to conduct a voir dire

---

[28] *See, e.g.*, *Thornton v. State*, 37 S.W.3d 490, 493 (Tex. App.—Texarkana 2000, pet. ref'd).

[29] In March 2015, the Texas Supreme Court and this Court made slight modifications to the wording of this Rule. These differences are irrelevant for the purpose of the issue presented.

examination directed to the underlying facts or data upon which the opinion is based. This examination shall be conducted outside the hearing of the jury.[30]

Here, the trial court granted the State's request for a hearing under Rule 705 of one of Appellant's experts.[31] During the hearing, the expert identified several of his opinions.[32] The trial court concluded that he was qualified to testify.[33] During the State's cross-examination, however, it asked him a question that was outside the scope of the topics identified during the Rule 705 hearing.[34] When Appellant attempted to elicit such an opinion on cross-examination, the trial court refused, stating that the expert was limited to the opinions previously disclosed.[35] Appellant offered to allow the State an opportunity to conduct a second Rule 705 hearing, but the trial court would not allow one.[36] The court of appeals affirmed this decision and concluded—without citation to any authority—that "the delay caused by a

---

[30] Tex. R. Evid. 705(b) (emphasis added).

[31] 7 R.R. 121:23–122:20.

[32] 7 R.R. 125:21—131:6.

[33] 7 R.R. 131:23–25.

[34] 7 R.R. 155:10–20.

[35] 7 R.R. 158:2, 7.

[36] 7 R.R. 164:11–19; 165:1–10.

second [Rule 705] hearing must be balanced against the probative value of the evidence sought to be admitted."[37]

Appellant respectfully submits that the lower courts erred in their interpretation of Rule 705, and that their errors warrant the attention of this Court. Nowhere in the Rule is there any suggestion that the expert may *only* offer opinions that are elicited at such a hearing. Instead, the rule makes clear that the "party against whom the opinion is offered" has the burden to request a hearing under Rule 705 if it seeks to challenge the expert's qualifications. By requiring Appellant to elicit *all* opinions during the initial hearing—including those that were not expected to be at issue because they arose for the first time during the State's cross-examination—the lower courts impermissibly grafted new requirements and limitations into the rule that—for good reason—do not exist. Because these courts are not permitted to re-write the Rules of Evidence (and apply them retroactively to Appellant), this Court should grant this petition for discretionary review to correct their erroneous interpretation.

---

[37] Opinion, p. 10.

## Conclusion and Prayer

This case presents three legal issues that have not been squarely addressed by this Court: (a) whether the double-jeopardy clause bars trials of multiplicitous offenses; (b) the State's evidentiary burden when seeking to admit non-forensic data; and (c) the proper procedure for disclosing and challenging expert opinions elicited for the first time during trial. Because the answers to these questions are important to the jurisprudence of this State, Appellant respectfully requests this Court to grant his petition for discretionary review.

Respectfully submitted,

s/ Matthew J. Kita

Matthew J. Kita
Texas Bar No. 24050883

P.O. Box 5119
Dallas, Texas 75208
(214) 699-1863 (phone)
(214) 347-7221 (facsimile)
matt@mattkita.com

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

This petition complies with Texas Rule of Appellate Procedure 9.4(i) because it contains 2,459 words (excluding the parts of the brief exempted by this rule).

Signed this 19th day of June, 2016.

s/ Matthew J. Kita
MATTHEW J. KITA

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this brief was served on the following counsel via ProDoc in accordance with Texas Rule of Appellate Procedure 9.5 and this Court's Local Rules on June 19, 2016.

*Counsel for Appellee:*

Emily Johnson-Liu
Collin County District Attorney's Office
2100 Bloomdale Road
McKinney, Texas 75071

s/ Matthew J. Kita
MATTHEW J. KITA

**AFFIRMED; Opinion Filed April 20, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01376-CR
### No. 05-14-01377-CR

**MATTHEW RYAN ARBANAS, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause Nos. 219-82622-2012 and 219-82623-2012**

## MEMORANDUM OPINION

Before Justices Francis, Evans, and Stoddart
Opinion by Justice Evans

Matthew Ryan Arbanas appeals the trial court's judgments sentencing him to 18 years' imprisonment with a fine of $10,000 for intoxication manslaughter and 10 years' imprisonment with a $10,000 fine for failing to stop and render aid. Appellant argues his conviction violates the constitutional protections against double jeopardy and the evidence is legally insufficient to support his convictions. We disagree with appellant's contentions and affirm the trial court's judgments.

## BACKGROUND

In the early morning hours of June 12, 2012, Billy Barnes was driving east on the President George Bush Turnpike, a multi-lane highway. The evening was clear and dry. Video from immediately before the accident shows that the rear taillights on Barnes's car were

operational. At approximately 2:20 a.m., Barnes's car was struck from behind by a blue Mercedes travelling at a much higher rate of speed in the same direction. The impact had sufficient force to push the backseat of Barnes's car into his head. Barnes's car impacted a wall and spun around so that it was facing in the opposite direction.

About a minute later, a car being driven by Kun "Ben" Yuk also collided with Barnes's car before swerving into a ditch at the side of the road. A bystander stopped, approached Yuk's car and asked if he should call 9-1-1. Yuk replied "yes." Yuk got out of his car and went over to Barnes's car. From where he was standing by Barnes's car, Yuk could see inside the Mercedes. Yuk noted aloud to the bystander that there was no one in the Mercedes and asked what happened. Yuk did not see anyone leaving the scene.

The first DPS officer to arrive at the crash site was highway patrol officer Gina Stone. Stone testified that when she arrived, Barnes was unconscious in the driver's seat of his car and appeared to be seriously hurt. According to Stone, there was significant damage to the rear of Barnes's car and to the front of the Mercedes. The backseat of Barnes's car had blood on it from its impact with Barnes's head.

Stone also examined the Mercedes. She stated the driver's side of the windshield was cracked and there was hair and human tissue on it. The driver's side airbag had deployed and there was blood on it as well as on the driver's seat and door. Inside the Mercedes, Stone found a black bag and a prescription bottle with the name "John Arbanas" on it. Stone also noticed an odor of alcohol in the car as if someone had spilled a drink, but found no open containers. Another prescription bottle with John Arbanas's name and some blood on it was found a short distance away. While she was inspecting the Mercedes, a cell phone in the car rang. Stone answered the phone and it was John Arbanas, appellant's father. Appellant's father told Stone that his car had been stolen.

At approximately 4:00 a.m., Richardson police received a call about a suspicious person lying in an apartment complex parking lot about a third of a mile away from the accident scene. Officer Samantha Lee went to investigate and found appellant lying with his head on a curb surrounded by a large amount of blood. Appellant was unresponsive and emergency services was called.

Appellant was taken to the hospital where he was treated in the emergency room by Dr. Michael Carrasco. Appellant was still unconscious when he arrived. A nurse drew blood for testing and the results showed a blood-alcohol concentration of .22. Appellant had an abrasion on his forehead and Dr. Carrasco ordered a CT scan. The scan showed no significant trauma to appellant's head. Because of the high alcohol content in appellant's blood and the absence of any significant head trauma, Dr. Carrasco concluded that appellant's lack of consciousness was due to alcohol intoxication and appellant was placed on alcohol withdrawal protocol.

Dr. Carrasco also treated Barnes when he was brought to the emergency room. Barnes came in unresponsive and unable to breath on his own. Dr. Carrasco stated that Barnes was bleeding from the back of his head. Despite treatment, Barnes ultimately died. The medical examiner testified that, in addition to a laceration on the back of his head that extended to the bone together with a brain hemorrhage, Barnes also had other injuries including lacerations of the liver and fractured ribs.

A state trooper who had been dispatched to the accident scene, officer Kevin Rhodes, was notified that a suspect had been found by the Richardson police and taken to the hospital. When Rhodes arrived at the hospital, he found appellant with a head injury consistent with the damage on the driver's side of the Mercedes. According to Rhodes, appellant had a "heavy odor of an alcoholic beverage like he'd been drinking." In addition, the "nurse notes" in appellant's

medical records state that appellant was "foul smelling from alcohol." Appellant finally regained consciousness approximately twenty-four hours after he was found in the parking lot.

The State indicted appellant for the offenses of manslaughter, intoxication manslaughter, and failure to stop and render aid following a motor vehicle accident. At trial, appellant's father testified that he and appellant had gone out to dinner on the evening before the accident and returned to the father's house. According to the father, appellant did not have a car and stayed either with him or with his mother at night. Appellant had been complaining about an abscessed tooth and the father told him they could go somewhere to take care of it in the morning. The father went to sleep around 10:30 or 11:00. Next to his pillow was a black bag containing prescription medication, the keys to his Mercedes, and his house keys.

Appellant's father woke up a few hours later to find appellant, the black bag, and his car gone. The father called 9-1-1 to report the car stolen and then called appellant's cell phone. When officer Stone answered appellant's phone, he told her that the car had been stolen. Appellant's father testified that neither he nor his son had any alcohol to drink during dinner and he kept no alcohol at his house.

Appellant also presented the testimony of Erica Deal, the younger sister of his former girlfriend. According to Deal, appellant telephoned her house several hours before the accident and told her mother that he was in the hospital because he "had some issues going on." Records showed that appellant went to the hospital complaining of pain in his teeth, abdominal pain, and bowel leakage. Deal stated that appellant had recently been diagnosed with HIV. Although Deal was only fifteen at the time, her mother dropped her off at the hospital to help appellant. Deal testified that appellant had been given some prescriptions at the hospital and she helped him look for the hospital pharmacy to have them filled. When they discovered the pharmacy was closed, appellant called several people and finally found someone to come pick them up. Deal said

–4–

appellant's friend dropped her off at her house around 1:30. Deal further stated that appellant did not seem intoxicated and did not have anything to drink while they were together.

After hearing the evidence, the jury convicted appellant of all three offenses. Before the trial court signed the judgments, the State abandoned the manslaughter charge and judgments were entered only as to the intoxication manslaughter and failure to stop and render aid charge. Appellant then brought this appeal.

**ANALYSIS**

**A. Double Jeopardy**

In his first issue, Appellant contends his conviction for intoxication manslaughter must be reversed because the fact that the jury was allowed to convict him of both intoxication manslaughter and manslaughter is a violation of the constitutional protections against double jeopardy. Appellant relies on the case of *Ervin v. State* in which the Texas Court of Criminal Appeals held that the offenses of intoxication manslaughter and manslaughter are the same criminal act for the purposes of double jeopardy when they involve the same victim. *See Ervin v. State*, 991 S.W.2d 804, 817 (Tex. Crim. App. 1999). The State responds that its abandonment of the manslaughter count before the trial court rendered judgment eliminated any double jeopardy violation. We agree.

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects a defendant against a second prosecution for the same offense and multiple punishments for the same offense. *See Evans v. State*, 299 S.W.3d 138, 140-41, (Tex. Crim. App. 2009). When the State seeks to punish the same criminal act twice under two distinct statutes, a double jeopardy claim based on multiple punishments arises. *See Shelby v. State*, 448 S.W.3d 431, 435 (Tex. Crim. App. 2014). The prohibition on multiple punishments does not, however, prevent the State from

simultaneously prosecuting the defendant under more than one statute when the same act violates multiple criminal statutes. *See Ball v. U.S.*, 470 U.S. 856, 860 nn.7 & 8 (1985). If the jury returns a guilty verdict under more than one statute for the same criminal act, the trial court may only render judgment on one of the statutory offenses. *Id.* at 865. If the trial court renders judgment and imposes punishment for only one statutory offense, there is no double jeopardy violation.

In this case, although the jury found appellant guilty of both manslaughter and intoxication manslaughter, the trial court rendered judgment and imposed punishment only for the intoxication manslaughter offense. Appellant argues that, despite the fact that the Double Jeopardy Clause has been held to prohibit only multiple punishments for the same criminal act, we should conclude that multiple charges also violate the constitutional protections against double jeopardy because "a multiplicitous jury charge may have a psychological effect that improperly prejudices a jury." Even if the State may obtain some strategic advantage by prosecuting the defendant under multiple statutes, this advantage does not rise to the level of a constitutional violation. *Id.* at 860. We resolve this issue against appellant.

**B. Sufficiency of the Evidence**

Appellant next contends the evidence is legally insufficient to support his conviction. He argues the only evidence that he was intoxicated was the results of the blood test administered by the hospital that treated him for his injuries. Appellant asserts various reasons why this evidence should either not have been admitted or cannot support the judgment against him. He further argues the trial court erred in excluding evidence he sought to offer on the physical effects of intoxication. We first address appellant's arguments that the blood test results should not have been admitted.

## 1) Admissibility of Hospital's EMIT Blood Test Results

Appellant contends the trial court erred in admitting the results of the blood test because the State presented no evidence that the test was properly applied and it failed to present witnesses qualified to testify about the scientific theory used in the testing or to translate or interpret the results. We review the trial court's admission of scientific evidence under an abuse of discretion standard. *See Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim. App. 1998). To be considered reliable, the proponent of scientific evidence must show that: (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question. *Kelly v. State*, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992). In some cases, the first two prongs of the test may be determined by judicial notice. *See Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012). "Once the validity of a scientific theory or technique has been widely accepted in a sufficient number of trial courts through adversarial gatekeeping hearings, future courts may take judicial notice of the validity of that theory or technique based upon the process, materials and evidence produced at those prior hearings." *Id*.

The blood test administered to appellant in this case was the enzyme-multiplied immunoassay technique (EMIT) test. The Texas Court of Criminal Appeals has already determined that "the reliability of even a single unconfirmed EMIT test has been sufficiently established that it meets the first two *Kelly* prongs." *Id*. at 545. Accordingly, we examine only whether the test was properly applied in this case.

At trial, the State presented the testimony of Sandra Jones, a lab technician, and Diane McClurg, the lab director for the hospital. McClurg testified regarding the use of the EMIT machine at the hospital, the quality control procedures, the protocol when a test result falls

within the critical range (as appellant's did), and the fact that the proper procedures were followed in appellant's case. Jones testified about how the blood test was performed by the EMIT machine, the quality control procedures, that she personally received the results of appellant's test from the EMIT machine, how she interpreted those results, and facts showing that the test was properly conducted.

Appellant contends the State's witnesses could not show that the test was properly applied because "they did not understand the scientific theory of the instrument." Both women testified, however, regarding the enzymatic process used by the machine and how the results are interpreted. Although McClurg and Jones may not have been able to answer several questions posed by appellant's counsel regarding some of the more detailed aspects of the scientific process, their testimony was sufficiently specific to establish the proper application of the test.[1] *Cf. Wooten v. State*, 267 S.W.3d 289, 301 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (trial court did not abuse discretion in admitting blood test results even though expert could not explain how enzymes interacted with alcohol).

Appellant further contends the test was not properly applied because an alcohol swab was used on his arm when the blood sample was taken. The use of a cleansing solution containing alcohol when conducting a test for blood-alcohol content merely goes to the weight of the evidence, not its admissibility. *See Kennemur v. State*, 280 S.W.3d 305, 317 (Tex. App.—Amarillo 2008, pet. ref'd). Appellant suggests McClurg and Jones were not capable of establishing the reliability of the test because they could not testify about how the machine accounted for interferents such as isopropyl alcohol that may have contaminated the blood

---

[1] Appellant suggests that, because McClurg and Jones could not answer all of his questions on cross-examination, they were not competent sponsoring witnesses for his medical records–specifically his blood test results. Appellant argues that it was a violation of his Sixth Amendment right to confront adverse witnesses for the State to fail to provide a competent sponsoring witness. Appellant did not raise an objection under the Sixth Amendment at trial and, therefore, this issue has not been preserved for our review. *See Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991).

sample. But McClurg testified that any interferents present in large enough quantities to affect the test results would be flagged. While appellant disagreed with McClurg and attempted to establish through cross-examination that isopropyl alcohol could affect the results of the test without registering as an interferent, this does not render her testimony insufficient to establish that the EMIT test was properly applied. Again, the potential effect of the alcohol swab on the blood test results goes to its weight, not its admissibility. *See Kennemur*, 280 S.W.3d at 317. Appellant was able to cross-examine the State's witnesses as to his theory and presented his own expert testimony concerning the potential inaccuracies of the blood test results. We conclude the trial court did not abuse its discretion in admitting the blood test results.

### 2) Exclusion of Testimony on Physical Effects of Alcohol

Appellant contends the trial court erred in excluding the testimony of his expert on the physical effects of alcohol. When appellant's counsel initially called his expert to testify, the State requested a hearing outside the presence of the jury under Rule 705 of the Texas Rules of Evidence to conduct a voir dire examination on the subject matter of the opinions the expert intended to offer. *See* TEX. R. EVID. 705(b) (before expert states opinion or discloses underlying facts or data, adverse party in criminal case must be permitted to examine expert about underlying facts or data outside presence of jury). At the hearing, appellant's counsel elicited testimony about the expert's opinion on the possible contamination of appellant's blood sample with isopropyl alcohol. Appellant's counsel then stated, "outside of that opinion you have no intention of conveying any other opinions to the jury here today aside from the fact that there are certain contaminants that can cause problems with the enzymatic test." The expert responded, "no, I have nothing to add to this. I will be guided strictly by what you've already discussed with me here. . . . I have no intention of introducing anything or going beyond that."

During his examination of the expert in front of the jury, appellant's counsel began to ask questions regarding the physical effects of alcohol at various blood-alcohol content levels. The State objected contending the questions went beyond the scope of what was presented in the rule 705 hearing. The trial court sustained the objection. Appellant offered to submit his expert for a second rule 705 hearing to allow the State to examine him on the topic of the physical effects of alcohol. The trial court refused to reopen the examination of the expert under rule 705 stating that appellant should have revealed all the opinions the expert intended to offer in the original hearing. Appellant made an offer of proof in which his expert testified that, even if appellant's blood-alcohol level was as high as alleged by the State, that level of intoxication would not have caused appellant to be unconscious as stated by Dr. Carrasco. The expert's opinion was based on a chart developed by a forensic toxicologist.

Appellant contends the trial court erred in excluding his expert's testimony. As stated above, we review the trial court's decision on the admission of scientific evidence for an abuse of discretion. *See Griffith*, 983 S.W.2d at 287. A court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. In this case, a second hearing under rule 705 to determine the admissibility of the expert's testimony would have required not only an examination of the expert's qualifications on the new subject, but the reliability of the chart upon which he intended to rely. The delay caused by a second hearing must be balanced against the probative value of the evidence sought to be admitted. The excluded evidence was probative only to refute Dr. Carrasco's testimony that appellant was unconscious when he arrived at the hospital because of his level of intoxication rather than any head trauma he suffered in the accident. The evidence would not show, as appellant suggests, that appellant was not intoxicated

–10–

at the time of the accident. At best, it would show only that the blood-alcohol level reflected in the blood test results was not, by itself, sufficient to cause him to black-out after the accident occurred. Given that appellant specifically stated his expert would not opine on topics other than those covered in the original rule 705 hearing, the extent of the delay a second hearing could cause, and the fact that the excluded evidence was not probative of appellant's defensive theory, we conclude the trial court did not abuse its discretion in excluding the evidence.

### 3) Legal Sufficiency of Evidence of Intoxication Manslaughter

Having addressed appellant's complaints regarding the admission and exclusion of evidence, we now address his contention that the evidence was legally insufficient to support his conviction. When reviewing a challenge to the legal sufficiency of the evidence supporting a criminal conviction, we view the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011). We do not resolve conflicts of fact, weigh evidence, or evaluate the credibility of the witnesses as this is the function of the trier of fact. *See Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Instead we determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the adjudication. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex. Crim. App. 1992). Each fact need not point directly and independently to the guilt of the appellant as long as the cumulative force of all the incriminating circumstances is enough to warrant conviction. *See Kennemur*, 280 S.W.3d at 313. Circumstantial evidence is as probative as direct evidence and can be sufficient alone to establish an accused's guilt. *Id.*

Appellant contends the evidence was legally insufficient to show that he was intoxicated at the time of the accident. Taken in the light most favorable to the verdict, the evidence shows

that, on an open section of dry, multi-lane highway, appellant drove his car into the rear of another vehicle at a sufficiently high rate of speed to push the rear seat of the vehicle into the back of the other driver's head. Then, despite the fact that he was injured, appellant fled the scene. An officer who inspected appellant's car shortly after the accident stated it had a strong odor of alcohol. Appellant was found a short distance away from the accident in an apartment complex parking lot lying in a pool of blood. No containers of alcohol were found nearby. Appellant was taken to the hospital where a nurse noted that he was "foul smelling from alcohol." A police officer that checked on appellant several hours after the accident also noted that appellant had a strong odor of alcohol. Blood test results showed that appellant had a blood-alcohol concentration of .22 more than two hours after the accident.

Appellant contends that this evidence is legally insufficient because there was no retrograde extrapolation testimony to show his blood-alcohol concentration at the time of the accident. Appellant's blood test results are probative of intoxication even in the absence extrapolation testimony, however. *See id*. at 316. The State need not prove appellant's exact blood-alcohol concentration at the time of the accident, but only that his mental or physical faculties were impaired by reason of the introduction of alcohol into his body. *Id*. at 313. The evidence of alcohol in appellant's system combined with the fact that he drove full speed into the back of a car with working taillights while on an open stretch of multi-lane highway in good weather is sufficient to show that appellant's faculties were impaired by the ingestion of alcohol.

Appellant further argues that the only direct evidence of his activities that night came from his father and the young sister of his former girlfriend. Both witnesses testified that appellant did not drink alcohol that evening. Accordingly, appellant argues the State needed to show that he ingested enough alcohol in the roughly one hour period between the time he was last seen by his ex-girlfriend's sister and the time of the accident to have a blood-alcohol

–12–

concentration of .22 several hours later. Appellant contends the evidence does not negate the possibility that he consumed the alcohol after the accident occurred.

Although appellant's witnesses testified they were with appellant on the night of the accident and that he did not consume alcohol, the jury was free to disbelieve this evidence. *See Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987). A rational juror could conclude it was more likely appellant consumed alcohol before the accident occurred than afterwards when he was found less than half a mile from the accident scene unconscious and bleeding with no containers of alcohol nearby. After reviewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient to support the conviction.

### 4) Legal Sufficiency of Evidence of Failing to Stop and Render Aid

Appellant contends the evidence is legally insufficient to show that he had the culpable mental state required to convict him for failing to stop and render aid. The culpable mental state required for the offense is that the accused had knowledge of the circumstances surrounding his conduct, i.e., had knowledge that an accident had occurred. *See Goss v. State*, 582 S.W.2d 782, 785 (Tex. Crim. App. 1979). An accused's lack of knowledge due to voluntary intoxication is not a defense. *See McCown v. State*, 192 S.W.3d 158, 163 n.2 (Tex. App.—Fort Worth 2006, pet ref'd).

Appellant contends the State had the burden to show that someone who sustained a head injury of the type he suffered would have been aware of his surroundings immediately afterwards. The State presented evidence, however, that a CT scan taken soon after the accident revealed no significant trauma to appellant's head. Furthermore, appellant's knowledge that an accident occurred can be established by inference from the circumstantial evidence. *See Jaynes v. State*, 673 S.W.2d 198, 201 (Tex. Crim. App. 1984) (overruled on other grounds). The amount of damage done to the vehicles involved, and the injuries sustained by appellant,

combined with the fact that appellant immediately fled the scene, is legally sufficient to show he knew that an accident had occurred.  We resolve this issue against appellant.

## CONCLUSION

Based on the foregoing, we affirm the trial court's judgments.


/David Evans/
DAVID EVANS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.1
141376F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MATTHEW RYAN ARBANAS, Appellant

No. 05-14-01376-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-82622-2012.
Opinion delivered by Justice Evans. Justices Francis and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 20th day of April, 2016.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

MATTHEW RYAN ARBANAS, Appellant

No. 05-14-01377-CR       V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-82623-2012.
Opinion delivered by Justice Evans. Justices Francis and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 20th day of April, 2016.